PUBLISH

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
09/17/99
THOMAS K. KAHN
CLERK

_____

No. 98-4741
_____

D.C. Docket No. 97-865-CR-SH

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

JOSE ANTONIO RODRIGUEZ-MATOS,
a.k.a. Jose Antonio Matos-Rodriguez,

Defendant-Appellant.

----------------
Appeal from the United States District Court
for the Southern District of Florida
----------------

**(September 17, 1999)**

Before BIRCH and DUBINA, Circuit Judges, and SMITH[*], District Judge.

SMITH, District Judge:

_____

[*] Honorable C. Lynwood Smith, Jr., U.S. District Judge for the Northern District of Alabama, sitting by designation.

Jose Antonio Rodriguez-Matos ("Matos") was charged in a four count indictment with making counterfeit currency in violation of 18 U.S.C. § 471,[1] selling counterfeit currency in violation of 18 U.S.C. § 473,[2] possessing counterfeit currency in violation of 18 U.S.C. § 472,[3] and assaulting a Secret Service Agent with a dangerous weapon (an automobile) in violation of 18 U.S.C. § 111(a).[4] He was convicted of the first three offenses by a jury, but acquitted of the assault

[1] 18 U.S.C. § 471 provides: "Whoever, with intent to defraud, falsely makes, forges, counterfeits, or alters any obligation or other security of the United States shall be fined under this title or imprisoned not more than fifteen years, or both."

[2] 18 U.S.C. § 473 provides:

Whoever buys, sells, exchanges, transfers, receives, or delivers any false, forged, counterfeited, or altered obligation or other security of the United States, with the intent that the same be passed, published, or used as true and genuine, shall be fined under this title or imprisoned not more than ten years, or both.

[3] 18 U.S.C. § 472 provides:

Whoever, with intent to defraud, passes, utters, publishes, or sells, or attempts to pass, utter, publish, or sell, or with like intent brings into the United States or keeps in possession or conceals any falsely made, forged, counterfeited, or altered obligation or other security of the United States, shall be fined under this title or imprisoned not more than fifteen years, or both.

[4] 18 U.S.C. §§ 111(a) provides that "whoever":

(1)     forcibly assaults, resists, opposes, impedes, intimidates, or interferes with any person designated in section 1114 of this title while engaged in or on account of the performance of official duties;  or

(2)     forcibly assaults or intimidates any person who formerly served as a person designated in section 1114 on account of the performance of official duties during such person's term of service, shall, where the acts in violation of this section constitute only simple assault, be fined under this title or imprisoned not more than one year, or  both, and in all other cases, be fined under this title or imprisoned not more than three years, or both.

2

charge. At sentencing the district court increased Matos' base offense level two levels for possession of a firearm in connection with the offense of selling counterfeit currency pursuant to United States Sentencing Guidelines ("Guidelines") § 2B5.1(b)(3), three levels for assaulting a law enforcement officer with an automobile (the acquitted conduct) pursuant to Guidelines § 3A1.2(b),[5] and two levels for recklessly creating a substantial risk of death or serious bodily injury to another person during flight from the scene of the crime pursuant to Guidelines § 3C1.2. We affirm.

## I. Background

This case began when a confidential informant notified the Miami Field Office of the United States Secret Service that Matos was producing counterfeit currency. The informant recorded a consensually monitored telephone conversation on November 8, 1997, during which Matos agreed to sell sixty counterfeit $20 bills for $300 in genuine currency. The deal thus arranged occurred later that same day under controlled circumstances outside the informant's residence. Secret Service agents and officers of the Metro-Dade

---

[5] Matos objected in the district court to enhancement of his sentence under § 3A1.2(b) on the basis of acquitted conduct. He does not raise that same issue here, and for good reason. We have held that "[r]elevant conduct of which a defendant was acquitted nonetheless may be taken into account in sentencing for the offense of conviction, as long as the government proves the acquitted conduct relied upon by a preponderance of the evidence." United States v. Barakat, 130 F.3d 1448, 1452 (11th Cir. 1997).

3

County, Florida, Police Department surreptitiously observed Matos as he drove a gold-colored Mercedes partially into the informant's driveway and sounded its horn. The informant walked from his house to the automobile and handed an envelope containing $300 in genuine currency to Matos through the open driver's window, receiving in exchange an envelope containing $1,500 in counterfeit currency: i.e., the sixty counterfeit $20 bills Matos had agreed to sell, plus a $300 "bonus" in fake Federal Reserve notes.

As Matos began to back his vehicle from the driveway, an automobile occupied by two Secret Service agents quickly moved into a position partially blocking the street. Plain-clothed Secret Service Agent Edwardo Garcia stepped from the passenger door of that vehicle, placed his right hand on the waistband of his pants — thereby drawing attention to his handgun and badge — extended his left hand in a manner signifying "halt," and yelled "stop, police." Agent Garcia later testified that Matos at first "looked startled and ... a bit surprised," but then, as Matos made "eye contact" with Garcia, his "expression turned to one of anger, he turned the wheels [of his automobile] towards me ... gunned the engine ... and came right towards me." Garcia used one hand to push off the hood of Matos' car as it sped by. One surveillance officer testified to observing Garcia "bouncing" off the hood of Matos' automobile. Although not injured, Agent Garcia was "pretty

4

scared" for the "first time" in his career.

Matos was pursued by Metro-Dade County police officers in two unmarked vehicles with flashing blue lights. The chase extended some distance, beginning at 12th Avenue near its intersection with 29th Street in Miami, and — after meandering several blocks northwardly, and then doubling back toward the south — ending near 16th Avenue and 29th Street. In the course of it, Matos "ran stop signs, ... made right turns at stop signs without stopping, ... drove in the opposite lanes or against oncoming traffic," sometimes at "better than double the speed limit." At one point, Matos was observed throwing an object from the driver's window of his automobile. A semiautomatic pistol with seven live rounds in the magazine later was recovered at that location. Matos eventually was apprehended, but only after pursuing officers boxed his automobile in a cul-de-sac from which there was no exit. Even then, Matos did not surrender peaceably, but had to be subdued.

A search of Matos' residence following arrest produced a Hewlett-Packard ink-jet color copier, paper, paper trimmings, cutting utensils, and other tools of the counterfeiting trade. A genuine $20 Federal Reserve note was found on the glass surface of the copy machine. Its serial numbers matched those on the bills sold to the informant. Finally, an additional $720 in counterfeit Federal Reserve notes was

seized. That amount, when added to the $1,500 sold to the informant, yielded a total of $2,220 in counterfeit currency attributable to Matos.

Following Matos' conviction on the counterfeiting charges embraced in counts one through three of the indictment, the investigative report prepared in anticipation of sentencing computed his base offense level as 15, in accordance with Guidelines § 2B5.1(b)(2).[6] The probation officer recommended three enhancements: (1) a two level increase under § 2B5.1(b)(3) for Matos' possession of a firearm in connection with the offense of selling counterfeit currency; (2) a three level upward adjustment under § 3A1.2(b) for Matos' assault of Secret Service Agent Garcia; and (3) an additional two level increase under § 3C1.2 for Matos' reckless operation of his motor vehicle during flight. The addition of these enhancements yielded an "adjusted offense level" of 22. Three levels then were

---

[6] Matos was sentenced on April 29, 1998. Accordingly, the 1995 Manual applied. Guidelines § 1B1.11(a) ("The court shall use the Guidelines Manual in effect on the date that the defendant is sentenced."). The guidelines for violations of 18 U.S.C. §§ 471, 472, and 473 are found in § 2B5.1, entitled "Offenses Involving Counterfeit Bearer Obligations of the United States." Sub-section (a) provides for a base offense level of 9. Sub-section (b)(1) directs that this base number should be increased "by the corresponding number of levels from the table at § 2F1.1 (Fraud and Deceit)" when the face value of the counterfeit items exceeds $2,000. One level thus was added to Matos' base offense level, because the aggregate amount seized ($2,220) was more than $2,000, but less than $5,000. Guidelines §§ 2F1.1(b)(1)(B), (C). In Matos' case, however, the determinative provision proved to be sub-section (b)(2), which provides that, "[i]f the defendant manufactured or produced any counterfeit obligation or security of the United States, or possessed or had custody of or control over a counterfeiting device or materials used for counterfeiting, and the offense level as determined above is less than **15**, increase to **15**." Guidelines § 2B5.1(b)(2).

6

deducted pursuant to §§ 3E1.1(a) and (b)[7] for Matos' "acceptance of

responsibility,"[8] resulting in a "final offense level" of 19.  That, together with

---

[7] U.S.S.G § 3E1.1, entitled "Acceptance of Responsibility," reads as follows:

(a)     If the defendant clearly demonstrates acceptance of responsibility for his offense, decrease the offense level by **2** levels.

(b)     If the defendant qualifies for a decrease under subsection (a), the offense level determined prior to the operation of subsection (a) is level **16** or greater, and the defendant has assisted authorities in the investigation or prosecution of his own misconduct by taking one or more of the following steps:

(1)     timely providing complete information to the government concerning his own involvement in the offense; or

(2)     timely notifying authorities of his intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial and permitting the court to allocate its resources efficiently,

decrease the offense level by **1** additional level.

[8] Prior to trial, in statements given to law enforcement officers, Matos admitted his guilt of the counterfeiting offenses.  Matos also offered to plead guilty to those offenses following indictment, but he always denied criminal culpability for the assault charge in Count Four.  The government refused to limit its prosecution, plea discussions ceased, and the case proceeded to a trial in which Matos maintained the same stance:  i.e., he admitted the counterfeiting offenses, but denied attempting to assault Secret Service Agent Garcia.  The jury acquitted Matos of the latter offense.  For such reasons, the probation officer recommended a full three level reduction for acceptance of responsibility.  By accepting that recommendation, the district court apparently concluded that Matos' case presented one of those "rare situations" discussed in Application Note 2 of the Commentary to § 3E1.1, in which "a defendant may clearly demonstrate an acceptance of responsibility for his criminal conduct even though he exercises his constitutional right to a trial":  i.e.,

This adjustment is not intended to apply to a defendant who puts the government to its burden of proof at trial by denying the essential factual elements of guilt, is convicted, and only then admits guilt and expresses remorse. Conviction by trial, however, does not automatically preclude a defendant from consideration for such a reduction.  In rare situations a defendant may clearly demonstrate an acceptance of responsibility for his criminal conduct even though he exercises his constitutional right to a trial.  This may occur, for example, where

7

Matos' criminal history category of I, suggested a guidelines' sentencing range of thirty to thirty-seven months.

Matos objected to all enhancements, but the district court overruled and sentenced him to concurrent terms of thirty-seven months imprisonment on each count of conviction. On this appeal Matos asserts: the district court erred by applying a § 2B5.1(b)(3) enhancement, because he did not use the firearm thrown from his vehicle "in connection with" the offense of selling counterfeit currency; the district court erred by applying an enhancement for reckless endangerment during flight under § 3C1.2; and, the district court's imposition of enhancements under both § 3A1.2(b) and § 3C1.2 constitutes impermissible "double counting." Following thorough review, we find no merit to defendant's second contention.[9]

a defendant goes to trial to assert and preserve issues that do not relate to factual guilt (e.g., to make a constitutional challenge to a statute or a challenge to the applicability of a statute to his conduct). In each such instance, however, a determination that a defendant has accepted responsibility will be based primarily upon pre-trial statements and conduct.

[9] See, e.g., United States v. Gonzalez, 71 F.3d 819, 836-37 (11th Cir. 1996) (affirming § 3C1.2 enhancement for defendant who operated vehicle in reverse, at a high rate of speed, on a residential street in an attempt to escape arresting officers, because such conduct "exhibited a reckless disregard for the safety of the various persons who resided on that street, as well as for the safety of those who might otherwise be present on that street") (emphasis supplied); United States v. Jones, 32 F.3d 1512, 1520 (11th Cir. 1994) (high speed chase on highway justified § 3C1.2 enhancement); United States v. Valdex, 146 F.3d 547, 554 (8th Cir. 1998) ("[W]e do not interpret § 3C1.2 to require that a high speed chase occur at night, in an urban area, or that any other vehicles actually ended up in harm's way.") (emphasis supplied); United States v. Conley, 131 F.3d 1387, 1390 (10th Cir. 1997) (rejecting defendant's contention that the government must put forth some evidence of imminent danger of injury or death to another person before § 3C1.2 applies).

8

Accordingly, we address only the first and last issues.

## II. Discussion

### A.    The Firearm Enhancement Under § 2B5.1(b)(3)

Application note 1 to § 2B5.1 explains that "[t]his guideline applies to counterfeiting of United States currency and coins, food stamps, postage stamps, treasury bills, bearer bonds and other items that generally could be described as bearer obligations of the United States, i.e., that are not made out to a specific payee."  Sub-section (a) provides that the "[b]ase offense level" for all such offenses is 9, while sub-section (b) addresses those commonly occurring, "specific offense characteristics" deemed by the Sentencing Commission to be most relevant to the determination of an offense level that most closely "fits" the crime actually committed.[10]

---

[10] "Specific offense characteristics," such as those described in § 2B5.1(b) or § 2K2.1(b) addressed infra,

> represent the Sentencing Commission's attempt to consider 'real offense' aspects of the underlying offense.  ...  The Guidelines state that, although they are 'closer to a charge offense [rather than a real offense] system,' they
>
> > take account of a number of important, commonly occurring real offense elements such as role in the offense, the presence of a gun, or the amount of money actually taken, through alternative base offense levels, specific offense characteristics, cross references, and adjustments.
>
> U.S.S.G. Ch. 1, Pt. A, Intro. p.s. 4(a); see also U.S.S.G. § 1B1.3, comment. (discussing consideration of relevant conduct in determining sentence).  Specific offense characteristics represent an integral part of the Guidelines' "return[] ... to an earlier philosophy that the punishment should fit the crime...."  ...

The part pertinent to this case, § 2B5.1(b)(3), provides: "If a dangerous weapon (including a firearm) was possessed in connection with the offense, increase by **2** levels. If the resulting offense level is less than level **13**, increase to level **13**." (Emphasis added.) Neither the text of that guideline nor the commentary to it defines what the Sentencing Commission intended by its use of the phrase, "in connection with." Moreover, this court has not previously addressed the relationship that must exist between a firearm and a counterfeiting offense for the § 2B5.1(b)(3) enhancement to apply.

For his part, Matos urges this court to follow by analogy the Fifth Circuit's decision in United States v. Fadipe, 43 F.3d 993 (5th Cir. 1995), where that court construed the same "in connection with" phrase, but as it is used in the context of § 2K2.1(b)(5), discussed infra.

The government, on the other hand, argues that this court should reason by analogy from our own decision in United States v. Young, 115 F.3d 834 (11th Cir. 1997), cert. denied, ___ U.S. ___, 118 S.Ct. 727, 139 L.Ed.2d 666 (1998), where we construed the same phrase in the context of § 4B1.4(b)(3)(A), pertaining to armed career criminals. For the reasons articulated below, we find the government's argument more compelling.

---

United States v. Condren, 18 F.3d 1190, 1198 (5th Cir.) (case citations omitted) (emphasis supplied), cert. denied, 513 U.S. 856, 115 S.Ct. 161, 130 L.Ed.2d 99 (1994).

The Fifth Circuit's decision in <u>Fadipe</u> grew from the following facts.  The defendant submitted a credit application containing false information to a Texas bank.  An attentive bank official reviewed the application, concluded it was fraudulent, and contacted the United States Secret Service.  Secret Service agents thereafter conducted a controlled delivery of bank checks to the defendant's apartment.  He was arrested after retrieving the checks from his mailbox, as he drove from the apartment complex.  Arresting officers "recovered a loaded gun from the front passenger area of Fadipe's automobile," together with "numerous applications for loans from various banks, records containing the personal and financial history of various individuals and other materials which could be used in bank fraud schemes."  <u>Id.</u> at 994.  Following the defendant's conviction for bank fraud[11] and unlawful possession of a firearm by an illegal alien,[12] the district court enhanced his base offense level pursuant to § 2K2.1(b)(5).

Section 2K2.1 of the Guidelines pertains to federal offenses involving "Unlawful Receipt, Possession, or Transportation of Firearms or Ammunition; Prohibited Transactions Involving Firearms or Ammunition."  Sub-section (b)(5) provides that:

> If the defendant used or possessed any firearm or ammunition

---

[11] 18 U.S.C. § 1344.

[12] 18 U.S.C. § 922(g)(5).

in connection with another felony offense; or possessed or transferred any firearm or ammunition with knowledge, intent, or reason to believe that it would be used or possessed in connection with another felony offense, increase by **4** levels.  If the resulting offense level is less than level **18**, increase to level **18.**

Guidelines § 2K2.1(b)(5) (emphasis added).  The Fifth Circuit reversed, saying:

> As a matter of law, we hold that the undisputed facts in this case fail to prove that the gun was used "in connection with" the bank fraud felony.  ...  The undisputed facts show no connection between the gun and Fadipe's bank fraud crime other than that the gun was present in Fadipe's automobile, along with other tools of Fadipe's bank fraud trade, when the checks were retrieved.  The enhancement under U.S.S.G. § 2K2.1(b)(5) was improper.

Id. (citation omitted).

The panel deciding Fadipe distinguished its holding from an earlier Fifth Circuit decision in United States v. Condren, 18 F.3d 1190 (5th Cir.), cert. denied, 513 U.S. 856, 115 S.Ct. 161, 130 L.Ed.2d 99 (1994), which had affirmed enhancement of a drug felony sentence under the same Guidelines section for a revolver found in the drawer of a desk in the defendant's bedroom.  (The significance of that fact lay under another:  police officers also found two rocks of crack cocaine and 33 grams of marijuana seed on the top of that same desk.)  See Condren, 18 F.3d at 1191.  The Fadipe court differentiated Condren as follows:

> This court took notice [in Condren] of the fact that "theft is a close and ever present partner of illegal drugs," and therefore upheld the trial court's finding that the gun was kept by the defendant to "help him protect his drug-related activities."  Id. at 1198-1200.  We

12

approved the connection between the gun and the felony based on the mere presence of the gun, because it could be assumed from the gun's presence alone that the gun was to be used "in connection with" the felony as a method of protection of the felonious activity. This court [in Condren also] thought this interpretation of U.S.S.G. § 2K2.1(b)(5) comported with the intent of the Guidelines to address the "real and obvious increase in the risk of violence" which exists whenever guns and drugs are found together. Id. at 1199.

In this case, the checks which Fadipe received in the controlled delivery had his name, phone number and address on them. It is not reasonable to assume that Fadipe had the gun present to prevent their theft. The presence of a gun near instruments of bank fraud does not create the same automatic increase in the danger of physical violence that exists when drugs and guns are present together.

Fadipe, 43 F.3d at 994-95 (quoting United States v. Condren, 18 F.3d 1190 (5th

Cir.), cert. denied, 513 U.S. 856, 115 S.Ct. 161, 130 L.Ed.2d 99 (1994)).[13]

---

[13] We note that the Fifth Circuit's decision in Condren — which the Fadipe panel set to one side, and Matos would have this court to ignore as inapposite, as addressing only the increased risk of violence arising from the dangerous mix of guns and drugs — does not appear on careful reading to be so narrow. For example, the Condren court observed that "§ 2K2.1(b)(5) mandates an enhancement even if the defendant only possesses a firearm in connection with any other felony." Condren, 18 F.3d at 1196 (emphasis in original). The Condren court emphasized that observation in a subsequent footnote: "We reiterate that the enhancement is required not only for use, but also simply for possession, of a firearm in connection with another felony. U.S.S.G. § 2K2.1(b)(5)." Condren, 18 F.3d at 1197 n.19 (emphasis in original).

Further, this court has cited Condren on at least three occasions as manifesting the Fifth Circuit's adoption of a simple possession test for determining when an enhancement is proper under Guidelines sections containing the same "in connection with" phrase at issue here. United States v. Young, 115 F.3d 834, 836-37 & n.3 (11th Cir. 1997) (citing Condren as adopting a "possession" test); United States v. Gainey, 111 F.3d 834, 837 (11th Cir. 1997) (citing Condren as holding "that mere possession of a firearm in connection with another felony qualifies the defendant" for enhancement of his base offense level under either Guidelines § 2K2.1(b)(5) or § 4B1.4(b)(3)(A)); United States v. Whitfield, 50 F.3d 947, 948 (11th Cir.) (construing Condren as "apply[ing] a more lenient nexus by analogy to U.S.S.G. § 2D1.1(b)(1), [and] holding that 'the enhancement is required not only for use, but also simply for possession, of a firearm in connection with another felony'" (emphasis in original)), cert. denied, 516 U.S. 889, 116 S.Ct.

13

Matos asks this court to construe § 2B5.1(b)(3) in an analogous manner, and to hold that the mere presence of a firearm in the automobile used by him to deliver counterfeit currency is not sufficient to show a "connection" between that handgun and the bogus currency sold to the informant. He argues that such circumstances do not create the same risk of violence that exists when guns and drugs are mixed.

There are distinctions between the facts of Fadipe and this case which require comment. The defendant in Fadipe was convicted of bank fraud, in violation of 18 U.S.C. § 1344. That offense was completed upon delivery of a credit application containing false information to the Texas bank.[14] The firearm subsequently found in the front passenger area of Fadipe's automobile was not connected with that act. Moreover, the checks which Secret Service agents caused to be delivered to Fadipe's apartment "had his name, phone number and address on

---

234, 133 L.Ed.2d 163 (1995); see also United States v. Flennory, 145 F.3d 1264, 1269-70 (11th Cir. 1998).

[14] See 18 U.S.C. § 1344, providing that:

Whoever knowingly executes, or attempts to execute, a scheme or artifice—

(1)     to defraud a financial institution; or

(2)     to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises;

shall be [guilty of a federal offense].

14

them." Fadipe, 43 F.3d at 994. For such reasons, the Fifth Circuit concluded it was "not reasonable to assume that Fadipe had the gun present to prevent their theft." Id. (emphasis added). In contrast, the offense of selling counterfeit currency in violation of 18 U.S.C. § 473 was completed only when Matos delivered fake Federal Reserve notes to the confidential informant.[15] Moreover, the counterfeit notes sold by Matos had no distinguishing characteristics. As a consequence, it is reasonable to assume that Matos had the gun present to prevent their theft, a point to which we shall return momentarily.

We find our own decision in United States v. Young, 115 F.3d 834 (11th Cir. 1997), cert. denied, ___ U.S. ___, 118 S.Ct. 727, 139 L.Ed.2d 666 (1998), to be more instructive. The defendant there was found guilty of being a convicted felon in possession of a firearm.[16] The district court sentenced him as an armed

---

[15] See note 2 supra.

[16] The grand jury's indictment charged that James R. Young

> did knowingly possess in and affecting commerce, a firearm described as a Remington bolt action rifle, Model 700, 270 caliber, serial number A6632175, and rounds of .22 caliber ammunition, which had been transported in interstate commerce in violation of Title 18, United States Code, Sections 922(g), and 924(e).

United States v. Young, 115 F.3d 834, 836 n.2 (11th Cir. 1997). The substantive section upon which that charge was based, 18 U.S.C. § 922(g)(1), provides in pertinent part that it "shall be unlawful for any person— (1) who has been convicted in any court of[] a crime punishable by imprisonment for a term exceeding one year ... to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce." In addition, 18 U.S.C. § 924(e)(1) provides:

career criminal under § 4B1.4(b)(3)(A), based upon its determination that Young

had stolen a rifle <u>during</u> the commission of a burglary and, accordingly, had

possessed the firearm "in connection with" that offense, a "crime of violence."[17]

<u>Young</u>, 115 F.3d at 836.  The burglary in which Young had stolen the rifle

occurred more than a year before his arrest on the federal charge of being a

convicted felon in possession of a firearm.  Even so,

> the Government presented evidence that the rifle possessed by Young
> was stolen from Mr. Anderson's home; that Young's fingerprints were
> found on the windowsill of Mr. Anderson's home where the burglar
> made his entrance; that the exterminator who sprayed Young's
> apartment saw the rifle in Young's attic several months after the
> burglary; and that Kristi S. [a fourteen-year-old runaway who had
> lived with Young] saw the rifle in the attic on two separate occasions
> following the burglary.  This evidence is sufficient to place Young at
> Anderson's residence on the date of the burglary.

<u>Id.</u> at 838.  Guidelines § 4B1.4(b), used as the basis for computing Young's base

offense level as "an armed career criminal," reads as follows:

    (b)    The offense level for an armed career criminal is the greatest of:

---

> In the case of a person who violates section 922(g) of this title and has
> three previous convictions by any court referred to in section 922(g)(1) of this
> title for a violent felony or a serious drug offense, or both, committed on
> occasions different from one another, such person shall be fined not more than
> $25,000 and imprisoned not less than fifteen years, and, notwithstanding any
> other provisions of law, the court shall not suspend the sentence of, or grant a
> probationary sentence to, such person with respect to the conviction under section
> 922(g).

[17] 18 U.S.C. § 924(e)(2)(B)(ii) defines the term "violent felony" as including the crime of burglary.

> (1) the offense level applicable from Chapters Two and Three; or
>
> (2) the offense level from §4B1.1 (Career Offender) if applicable; or
>
> (3) (A) **34**, if the defendant used or possessed the firearm or ammunition <u>in connection with</u> a crime of violence or controlled substance offense, as defined in §4B1.2(1), or if the firearm possessed by the defendant was of a type described in 26 U.S.C. § 5845(a); or
>
>     (B) **33**, otherwise.  [Emphasis added.]

The district court applied sub-section (b)(3)(A).  Young appealed, contending "the district court erred in sentencing him as an armed career criminal under U.S.S.G. § 4B1.4(b)(3)(A) because [his] possession of the firearm was not 'in connection with' the burglary...."  <u>Id.</u> at 836.  This court affirmed, holding "the firearm stolen in the burglary <u>was</u> possessed 'in connection with' that burglary."  <u>Id.</u> (emphasis in original).  We reached that conclusion by affording the phrase "in connection with" an expansive construction, in effect holding that it did not matter whether Young had entered the dwelling with the gun in his hand, or obtained it while burglarizing the house, as a fruit of the crime.  <u>See id.</u> at 836-38; <u>see also</u> <u>United States v. Guerrero</u>, 5 F.3d 868, 873 (5th Cir. 1993) ("If armed burglars encounter the occupants of a home or law enforcement officials, it makes little difference how the burglars obtained their firearms."), <u>cert. denied</u>, 510 U.S. 1134, 114 S.Ct. 1111,

17

127 L.Ed.2d 422 (1994).

Of more importance to the present appeal, however, is the fact that in Young

we rejected a more restrictive test adopted by some of our sister circuits, the so-

called "facilitation test."

> Young urges this court to adopt, by analogy, the reasoning of
> other circuits which have addressed the "in connection with" language
> in U.S.S.G. § 2K2.1(b)(5). These circuits hold that the "in connection
> with" language requires more than mere use or possession. These
> circuits hold that the "in connection with" requirement is satisfied
> only when the firearm serves a purpose related to the crime; its
> presence or involvement must not be the result of accident or
> coincidence. United States v. Wyatt, 102 F.3d 241, 247 (7th Cir.
> 1996); United States v. Nale, 101 F.3d 1000, 1003 (4th Cir. 1996);
> United States v. Thompson, 32 F.3d 1, 7 (1st Cir. 1994); United States
> v. Routon, 25 F.3d 815, 819 (9th Cir. 1994); United States v. Gomez-
> Arrellano, 5 F.3d 464, 466-67 (10th Cir. 1993). These cases applied
> the definition of "in relation to" in 18 U.S.C. § 924(c), as interpreted
> by the Supreme Court in Smith v. United States, 508 U.S. 223, 238,
> 113 S.Ct. 2050, 2058, 124 L.Ed.2d 138 (1993), and held that a
> weapon is used "in connection with" an offense under § 2K2.1 if the
> weapon facilitated or potentially facilitated the felonious conduct.
> Thompson, 32 F.3d at 7; Routon, 25 F.3d at 819; Gomez, 5 F.3d at
> 466-67.

> We conclude that the Fifth Circuit's interpretation of Smith [in
> Guerrero, 5 F.3d at 872-73, holding that the phrase "in connection
> with" should be given an expansive interpretation, according to its
> ordinary and natural meaning,] is more accurate and pertinent to the
> issue presented here. Accordingly, we decline to follow the other
> circuits' rationales which defined the language of § 2K2.1. ...

Young, 115 F.3d at 838.

We are unable to discern any principled reason why we should follow a path

18

of reasoning different from that marked by our decision in <u>Young</u>, when attempting to arrive at the construction that should be accorded the same "in connection with" phrase found in § 2B5.1(b)(3). As we discussed earlier, in contrast to the circumstances addressed by the Fifth Circuit in <u>Fadipe</u>, it <u>is</u> reasonable to conclude here that Matos possessed the pistol to prevent theft during a close, face-to-face, hand-to-hand encounter with a person he apparently did not know well. The district court said as much when overruling Matos' objection to this enhancement.

> With regard to the matter of the firearm, first of all, I agree with the Fifth Circuit [in <u>Guerrero</u>].... And the Court finds that the gun was ... indeed possessed in connection with the offense of conviction.

> In that regard, the Court has no difficulty in recognizing the fact that the defendant at the time he entered into the agreement to deliver the counterfeit money was quite aware, at least he thought he was dealing with someone else who was willing to break the law and if the one he was dealing with was willing to break the law in order to obtain counterfeit money, perhaps he needed some protection in that regard, to protect his merchandise, if you will.

> And thus, he took a firearm along with him to guard against the potential that his other ... partner in crime ... might very well be inclined to conclude the deal without handing over the three hundred dollars in legitimate currency.

Matos reinforced this conclusion following arrest, when he sought to explain his high-speed flight by saying he felt he was "going to be robbed."

Of course, the district court's factual findings on disputed sentencing issues

19

are scrutinized only for clear error, <u>United States v. Gonzalez</u>, 71 F.3d 819, 836 (11th Cir. 1996), but its interpretation and application of the Sentencing Guidelines are reviewed <u>de</u> <u>novo</u>.  <u>United States v. Delgado</u>, 56 F.3d 1357, 1363 (11th Cir. 1995), <u>cert. denied</u>, 516 U.S. 1049, 116 S.Ct. 713, 133 L.Ed.2d 667 (1996).  In that regard, we cannot say either that the district court's factual conclusions concerning Matos' possession of the firearm were clearly wrong, or that it was error to assess a two level enhancement pursuant to § 2B5.1(b)(3) under the circumstances of this case.

**B.      The Double Counting Issue**

Matos also contends the district court erred by applying both a three level enhancement under § 3A1.2(b) for assaulting an officer during flight,[18] and a two level enhancement under § 3C1.2 for reckless endangerment during flight.[19]  He argues this constitutes "double counting."

"Impermissible double counting occurs only when one part of the Guidelines is applied to increase a defendant's punishment on account of a kind of harm that

---

[18] Guidelines § 3A1.2(b), pertaining to "Official Victim[s]," directs that a defendant's base offense level be increased by 3 levels "[i]f ... during the course of the offense or immediate flight therefrom, the defendant or a person for whose conduct the defendant is otherwise accountable, knowing or having reasonable cause to believe that a person was a law enforcement or corrections officer, assaulted such officer in a manner creating a substantial risk of serious bodily injury...."

[19] U.S.S.G § 3C1.2, entitled "Reckless Endangerment During Flight," provides:  "If the defendant recklessly created a substantial risk of death or serious bodily injury to another person in the course of fleeing from a law enforcement officer, increase by **2** levels."

has already been fully accounted for by application of another part of the Guidelines." United States v. Alexander, 48 F.3d 1477, 1492 (9th Cir.) (citation and internal quotation marks omitted), cert. denied, 516 U.S. 878, 116 S.Ct. 210, 133 L.Ed.2d 142 (1995).

This court reviews de novo a double counting claim. United States v. Aimufua, 935 F.2d 1199, 1200 (11th Cir. 1991). "Double counting during sentencing is permissible if the Sentencing Commission intended the result, and if the result is permissible because each section concerns conceptually separate notions related to sentencing." United States v. Adeleke, 968 F.2d 1159, 1161 (11th Cir. 1992) (citations and internal quotation marks omitted).

Further, this court presumes the Sentencing Commission intended to apply separate guideline sections cumulatively, unless specifically directed otherwise. United States v. Stevenson, 68 F.3d 1292, 1294 (11th Cir. 1995); see also Aimufua, 935 F.2d at 1200. It is this last proposition that forms the major premise of Matos' double counting argument. He asserts the commentary to § 3C1.2 clearly directs that a two level enhancement for reckless endangerment should not have been imposed.

> Do not apply this enhancement where the offense guideline in Chapter Two, or another adjustment in Chapter Three [e.g., § 3A1.2(b)], results in an equivalent or greater increase in offense level solely on the basis of the same conduct.

21

Guidelines § 3C1.2, Comment., Application Note 1 (emphasis supplied).

The Fourth Circuit opined in United States v. Sloley, 19 F.3d 149, 154 (4th Cir. 1994), that "[i]f both § 3A1.2(b) and § 3C1.2 apply to a defendant, the court must apply only the former and increase the offense level by three levels." We do not find that pronouncement persuasive for two independent reasons and, therefore, reject it for application in this circuit. First, the statement is dictum. The district court in Sloley had applied only § 3A1.2(b) and, accordingly, the Fourth Circuit was not presented a controversy in which it was necessary to determine whether it is possible to add additional levels under § 3C1.2. Second, as the Seventh Circuit observed in United States v. Swoape, 31 F.3d 482, 483 (7th Cir. 1994), the Fourth Circuit's gratuitous pronouncement in Sloley simply "is wrong."

> The fourth circuit quoted from comment 1 to § 3C1.2, which says: "Do not apply this enhancement where ... another adjustment in Chapter Three ... results in an equivalent or greater increase in offense level solely on the basis of the same conduct." The Sentencing Commission included a vital qualifier — "solely on the basis of the same conduct" — that disappeared from the fourth circuit's summary of its conclusion. It is the Sentencing Commission's understanding of its rules, and not an incomplete summary by a court of appeals, that governs here. Stinson v. United States, 508 U.S. 36, 113 S.Ct. 1913, 123 L.Ed.2d 598 (1993). ...

Swoape, 31 F.3d at 483.[20]

---

[20] The "commentary in the Guidelines Manual that interprets or explains a guideline is authoritative unless it violates the Constitution or a federal statute, or is inconsistent with, or a plainly erroneous reading of, that guidleine." Stinson v. United States, 508 U.S. 36, 38, 113

Specifically, therefore, the issue confronting this court is whether enhancements under both § 3A1.2(b) and § 3C1.2 were levied upon Matos "solely on the basis of the same conduct." If so, then Matos is correct: it is impermissible double counting. We have not been aided in our decision by the court below, however, because the district court did not address Matos' double counting objection during sentencing. Moreover, this court has not previously addressed the cumulative imposition of enhancements under the same Guidelines sections. Even so, four circuits, not counting the Fourth, have spoken to the issue, and it is to those decisions that we now turn for guidance.

The Sixth Circuit held in United States v. Hayes, 135 F.3d 435 (6th Cir. 1998), that the cumulative application of enhancements under both § 3A1.2(b) and § 3C1.2 to the computation of the offense level of a defendant who pled guilty to two counts of unlawful possession of cocaine with the intent to distribute, and no contest to a charge of assaulting a law enforcement officer, was impermissible double counting. The underlying facts of Hayes bear a superficial resemblance to the present case. In Hayes, for example, plain-clothed Chattanooga, Tennessee police officers and DEA agents, driving unmarked vehicles, moved from

S.Ct. 1913, 1915, 123 L.Ed.2d 598 (1993). Further, "the Guidelines bind judges and courts in the exercise of their uncontested responsibility to pass sentence in criminal cases." Mistretta v. United States, 488 U.S. 361, 391, 109 S.Ct. 647, 665, 102 L.Ed.2d 714 (1989).

23

surveillance positions in a residential neighborhood to arrest the defendant, who then was seated behind the steering wheel of his own automobile. DEA Agent Hinton exited his vehicle, "drew his weapon, and, standing behind the car door, yelled, 'Get out of your vehicle. Police.'" Id. at 436. The defendant did not obey, but instead

> "punched" the accelerator and the car accelerated at a high speed, aimed directly at Agent Hinton. Hinton screamed, "stop" and jumped back into the unmarked Maxima. Defendant's vehicle hit Hinton's car door, and the door struck Hinton on the shoulder and leg as he jumped into his car. The impact shook the car, and Officer McPherson was knocked out of the car. After sideswiping the Maxima, defendant continued to drive ahead. Two or three car lengths later, he crashed head-on into a third unmarked police car, a white Lincoln Continental. Defendant was promptly arrested. Officer McPherson then heard a child crying from defendant's vehicle; when he looked into the car, he found a five- or six-year old boy lying on the floor of the car with his nose and mouth bleeding. Officer McPherson immediately called for an ambulance. ...

Id. at 436-37. The district court imposed a three level enhancement under § 3A1.2(b) for the defendant's assault of Agent Hinton when his vehicle struck Hinton's car door, and an additional two levels under § 3C1.2 for the defendant's creation of "a substantial risk of death or serious bodily injury to the young boy riding in his car when he accelerated in an attempt to flee police." Id. at 437. The Sixth Circuit reversed, saying the same conduct was the sole basis for both enhancements.

24

We see no sensible way to distinguish the conduct that formed the basis for the two enhancements. Defendant sought to escape from the police by punching his car's accelerator. This single, uninterrupted act resulted in injury to a law enforcement officer and put a young child in danger. Defendant's conduct risked harm to two different individuals, but the underlying conduct was the same, namely the rapid acceleration of defendant's car in the direction of other occupied vehicles. To suggest that the conduct that caused the assault of Hinton was different from that which placed the young child in danger would be "an artificial and unrealistic division of a single uninterrupted course of conduct into separate events." ... We, therefore, hold that the District Court erred....

Id. at 438 (citation omitted).

In United States v. Swoape, 31 F.3d 482 (7th Cir. 1994), on the other hand, the Seventh Circuit held that a defendant found guilty of armed bank robbery properly received a three level enhancement under § 3A1.2(b) because he shot three police officers, and an additional two level enhancement under §3C1.2 because he recklessly endangered many civilians during a high-speed chase and shootout with police in a restaurant parking lot.

C. Bret Swoape entered a bank, leveled a shotgun at a teller, and demanded money. He directed all of the bank's employees to lie on the floor, leapt the counter, and scooped up more than $12,500 before fleeing in a stolen car. Soon he switched to another stolen car, which loses the police in the movies but not always in real life. A police car took up pursuit, caught Swoape at a roadblock, and pushed his car into a ditch. Swoape bounded out, shot the officer, and got his car back under way. By now several additional patrol cars were in the hunt. After a high-speed chase through a populated area, an officer rammed Swoape's car, which swerved into the parking lot of a McDonald's restaurant. There Swoape made a stand, firing his

25

shotgun and hitting two more officers. Before he could reload, the remaining officers took him into custody.

Id. The Seventh Circuit succinctly held these events were "different conduct, making cumulative adjustments appropriate. ... This is not double counting." Id. at 483.

In like manner, the Eighth Circuit held that a district court properly increased the offense level of a defendant convicted of drug-related offenses under § 3A1.2(b) "for assaulting a police officer when he rammed his car into a police roadblock," and also under § 3C1.2 "for his chase-related conduct that created a risk of serious injury to other drivers and pedestrians." United States v. Miner, 108 F.3d 967, 970 (8th Cir. 1997).

Finally, in United States v. Alexander, 48 F.3d 1477, 1493 (9th Cir.), cert. denied, 516 U.S. 878, 116 S.Ct. 210, 133 L.Ed.2d 142 (1995), the Ninth Circuit held that it was not duplicative to accumulate enhancements under both § 3A1.2(b) and § 3C1.2 when computing the offense levels of defendants who had fired shots at pursuing police officers during the course of a high-speed chase from the location of an armed bank robbery.[21]

---

[21] See United States v. Alexander, 48 F.3d 1477, 1493 (9th Cir.) (footnote omitted), cert. denied, 516 U.S. 878, 116 S.Ct. 210, 133 L.Ed.2d 142 (1995), where the court said:

Punishment for the shots fired by the defendants while fleeing from the scene of the crime was imposed by virtue of the official victim enhancement, § 3A1.2(b). Moreover, the official victim enhancement reflected not only the shooting, but

The present case is distinguishable from Swoape and Alexander, because the defendants in those cases received enhancements under § 3A1.2(b) for assaulting officers by shooting at them. Although Matos may fail to appreciate the irony, his case is most like Hayes, which conversely persuades us that it was appropriate for the district court to impose cumulative enhancements under both § 3A1.2(b) and § 3C1.2.

Matos' conduct did not occur in a small area of only "two or three car lengths," or in a brief expanse of time. Rather, Matos' assault of Agent Garcia was separated temporally and spatially from his subsequent, reckless conduct in leading police officers on a high speed chase. This was not a single, uninterrupted event. The enhancements were not levied "solely on the basis of the same conduct."

Accordingly, the judgment and sentence of the district court are AFFIRMED.

---

also the fact that the defendants in the Camaro almost ran over a motorcycle officer during their attempted getaway. ...

• • •

[T]he reckless endangerment provision [§ 3C1.2] applied not only because shots were fired during the attempted getaway, but also because of the risk of injury to civilians caused by the high-speed chase and by the defendants' serious violations of other traffic laws. There was no double counting.

27