[DO NOT PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 19-12990

Non-Argument Calendar

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

SANTOS RIVERA-FERNANDEZ,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Middle District of Alabama
D.C. Docket No. 1:18-cr-00011-ALB-SMD-3

_____

Before JILL PRYOR, GRANT, and ANDERSON, Circuit Judges.

PER CURIAM:

Defendant Santos Rivera-Fernandez appeals his 116-month sentence, which was imposed after he pled guilty to conspiring to distribute 50 grams or more of methamphetamine. On appeal, Rivera-Fernandez argues that the district court erred by applying a sentencing enhancement under U.S.S.G. § 2D1.1(b)(5) after incorrectly determining that his offense involved the importation of methamphetamine. After careful review, we conclude that the district court did not err in applying § 2D1.1(b)(5). For the following reasons, we affirm.

## I.  BACKGROUND

### A.  Rivera-Fernandez's Arrest

This case arises out of a police investigation into methamphetamine distribution in Enterprise, Alabama. The investigation revealed that a supplier in Mexico was providing methamphetamine to a suspected Alabama gang through drug transactions in Georgia. To purchase methamphetamine, a gang member messaged the supplier in Mexico. The supplier provided the gang member with a code word and a telephone number for a person in the Atlanta area to finalize the deal. The gang member then traveled to the Atlanta area to complete the transaction.

As part of the investigation, an undercover officer set up a methamphetamine purchase from the supplier in Mexico.

Following the supplier's instructions, the undercover officer traveled to the Atlanta area to buy four kilograms of methamphetamine. The undercover officer met Rivera-Fernandez and another individual at a designated location set up by the supplier. The police arrested Rivera-Fernandez and seized four kilograms of methamphetamine and a shotgun from his car. Of these four kilograms, approximately one kilogram was 78% pure. The remaining 3 kilograms were 97% pure.

Further investigation uncovered additional information about the drug operation. A member of the Alabama gang told investigators that he believed the supplier in Mexico was part of a drug cartel in that country. In addition, Rivera-Fernandez told officers that he had reached out to a childhood acquaintance living in Mexico with the understanding that he would start trafficking narcotics. Rivera-Fernandez stated that after this conversation he received 11 kilograms of methamphetamine and made several deliveries before his arrest. Rivera-Fernandez's cell phone showed that he received multiple calls from the supplier. One of these calls took place on the day of his arrest.

## B.    Procedural History

After his arrest, the government charged Rivera-Fernandez and several others with conspiracy to distribute 50 grams or more of methamphetamine. Rivera-Fernandez pled guilty to this charge. In preparing his Presentence Investigation Report ("PSR"), Rivera-Fernandez's probation officer determined that his base offense level was 36 under U.S.S.G. § 2D1.1(c)(2). The probation officer

also applied a two-level increase under § 2D1.1(b)(1) because the police found a gun in Rivera-Fernandez's car during his arrest and an additional two-level increase under § 2D1.1(b)(5) because the offense involved the importation of methamphetamine from Mexico. He received a two-level reduction for accepting responsibility and a one-level reduction for assisting authorities under § 3E1.1(a) and (b). The probation officer calculated Rivera-Fernandez's total offense level as 37. Rivera-Fernandez had no criminal history, resulting in a criminal history category of I. Based on a total offense level of 37 and a criminal history category of I, the PSR reported Rivera-Fernandez's guideline range was 210 to 262 months' imprisonment.

Rivera-Fernandez objected to several portions of the PSR. Relevant to this appeal, he objected to the two-level increase for the offense involving the importation of methamphetamine. He argued that it "would be error to apply the importation adjustment without evidence of the foreign origin of the methamphetamine." Doc. 566 at 14 (capitalizations omitted). [1] He also argued that there was no evidence he knew that the drugs were imported from Mexico. Rivera-Fernandez further objected to the drug purity calculations, but he objected to no other facts in the PSR.

The government responded to Rivera-Fernandez's objection to the importation enhancement. The government argued that the methamphetamine's purity indicated that it was from

---

[1] "Doc." numbers refer to district court docket entries.

Mexico. It attached a 2018 report from the Drug Enforcement Agency (DEA) stating that cartels in Mexico are the primary producers of high-quality methamphetamine found in the United States. In addition, the government provided text messages between the supplier in Mexico and another co-defendant where the supplier stated he would send methamphetamine from his location. The government also offered messages from a different conversation that the supplier had with an undercover agent. In these messages, the supplier discussed an individual who was arrested while crossing the border into the United States with drugs.

The district court held a hearing on Rivera-Fernandez's objections. The court concluded that the importation enhancement was appropriate. With the enhancement, the court determined that Rivera-Fernandez's total offense level was 33[2] and his criminal history category was I, yielding a guidelines range of 135 to 168 months' imprisonment.

But the district court determined that the government had "been inconsistent in seeking [the importation] enhancement with respect to defendants as part of this conspiracy." Doc. 739 at 5. Because of this inconsistency, the court decided to "vary downward [Rivera-Fernandez's offense] by two levels and effectively take that

---

[2] At the sentencing hearing, the district court determined that the firearm enhancement under § 2D1.1(b)(1) was inapplicable. It also found that Rivera-Fernandez was eligible for safety valve relief and thus entitled to a further two-level reduction in his offense level. *See* U.S.S.G. § 5C1.2.

6                    Opinion of the Court                    19-12990

enhancement off the back end." *Id.* The court then denied Rivera-Fernandez's objection to the drug purity calculation. After deducting the two points from the offense level, the court determined that his offense level was 31 with a criminal history of I, providing a guidelines range of 108 to 135 months' imprisonment. The Court considered the 18 U.S.C. § 3553(a) factors and sentenced Rivera-Fernandez to 116 months' imprisonment.

Rivera-Fernandez timely appealed his sentence to this Court.

## II.    STANDARD OF REVIEW

We review the district court's factual findings at sentencing for clear error, but we review the district court's application of the Sentencing Guidelines *de novo. United States v. Matos-Rodriguez*, 188 F.3d 1300, 1309 (11th Cir. 1999). The burden of establishing evidence of the facts necessary to support a sentencing enhancement falls on the government; it must do so by a preponderance of the evidence. *United States v. Perez-Oliveros*, 479 F.3d 779, 783 (11th Cir. 2007).[3]

---

[3] The government argues that harmless error review applies to the district court's decision because the district court applied the importation enhancement but decided to "take the enhancement off the back end" by varying the offense level downward by two. Appellee Brief at 13 (quoting doc. 739 at 5). "Where a district judge clearly states that he would impose the same sentence, even if he erred in calculating the guidelines, then any error in the calculation is harmless." *United States v. Barner*, 572 F.3d 1239, 1248 (11th Cir. 2009). Although the district court decreased the offense level by two, it never stated that

## III.    ANALYSIS

Rivera-Fernandez contends that the district court erred by imposing the importation enhancement under § 2D1.1(b)(5). Specifically, he argues that the government failed to prove that the methamphetamine was imported from Mexico. He also argues that the government failed to show that he had sufficient involvement in the importation or that he knew that the drugs came from Mexico. We address these arguments in turn.

## A.    The District Court Did Not Err by Finding that the Methamphetamine Originated in Mexico.

Under the Sentencing Guidelines, a court should impose a two-level enhancement if among other things "the offense involved the importation of . . . methamphetamine or the manufacture of . . . methamphetamine from listed chemicals that the defendant knew were imported unlawfully." U.S.S.G. § 2D1.1(b)(5). Rivera-Fernandez argues that the evidence fails to establish that the methamphetamine was imported. We disagree.

The government presented several pieces of evidence to the district court in support of the importation enhancement. This evidence included a DEA report stating that criminal organizations in Mexico continue to be the primary suppliers of high purity methamphetamine. It further provided that most of the

Rivera-Fernandez's sentence would have been the same without the importation enhancement. Without this clear statement, we cannot apply harmless error review.

methamphetamine available in the United States is from Mexico. The police arrested Rivera-Fernandez with four kilograms of methamphetamine; approximately three of those kilograms were 97% pure. In addition, the government provided the district court with messages between the methamphetamine supplier in Mexico and a co-defendant. In one of the messages, the supplier described sending drugs from his location. The government also submitted an additional conversation between the supplier and an undercover agent. In this conversation, the supplier discussed an individual who got arrested while crossing the Texas border with drugs.

Apart from the evidence submitted by the government, the district court also considered and adopted the PSR. According to the PSR, the methamphetamine supplier resided in Mexico and was part of a drug cartel in the country. The PSR further stated that an undercover investigator ordered methamphetamine from the supplier and then at the purchase location met Rivera-Fernandez who had four kilograms of methamphetamine. Rivera-Fernandez did not object to these specific facts, so the district court could consider them undisputed. *See United States v. Beckles,* 565 F.3d 832, 844 (11th Cir. 2009) ("Facts contained in a [PSR] are undisputed and deemed to have been admitted unless a party objects to them before the sentencing court with specificity and clarity." (internal quotation marks omitted)). Given all this evidence, we cannot say "with a definite and firm conviction" that the district court clearly erred by determining that the methamphetamine came from

Mexico. *United States v. Cruickshank,* 837 F.3d 1182, 1192 (11th Cir. 2016) (internal quotation marks omitted).

Rivera-Fernandez's reliance on an unpublished Fifth Circuit case as persuasive authority does not change our decision. In *United States v. Nimerfroh*, 716 F. App'x 311, 315–16 (5th Cir. 2018) (unpublished), the defendant appealed the district court's decision to apply the importation enhancement when calculating his sentence for conspiracy to possess with intent to distribute methamphetamine. The district court determined that the methamphetamine originated from Mexico because the PSR noted that the defendant "made statements that he was dealing with the 'cartel.'" *Id.* at 316. On appeal, the Fifth Circuit determined that "the mere reference to a cartel" was insufficient to prove by a preponderance of the evidence that the methamphetamine was imported. *Id.* The Fifth Circuit reasoned that even if "the word 'cartel' could be read to mean a Mexican cartel," nothing in the record showed that the cartel's activities took place in Mexico and not the United States. *Id.*

Unlike the district court in *Nimerfroh*, the district court here relied on more evidence than just the use of the word "cartel" to conclude that the drugs were imported from Mexico. To review, the district court received evidence showing that the supplier was living in Mexico and part of a drug cartel there, that he sent a message stating that the drugs came from his location, and that Rivera-Fernandez brought methamphetamine to a designated place arranged by the supplier. Evidence also showed that the purity of

Rivera-Fernandez's methamphetamine indicates that the drugs originated in Mexico. Although it is possible that the methamphetamine originated in the United States, the district court's finding that they came from Mexico was not clearly erroneous. Under our precedent, a district court's "choice between 'two permissible views of the evidence'" rarely constitutes clear error as long as the "decision is supported by the record and does not involve a misapplication of a rule of law." *United States v. Rodriguez De Varon*, 175 F.3d 930, 945 (11th Cir. 1999) (emphasis omitted) (quoting *Anderson v. City of Bessemer City,* 470 U.S. 564, 574 (1985)). We conclude that the district court did not clearly err by determining that the methamphetamine originated in Mexico.

B.      **The District Court Did Not Err by Finding that Rivera-Fernandez was Involved in the Importation of Methamphetamine and that He Knew the Drugs Came from Mexico.**

Rivera-Fernandez next argues that even if the methamphetamine came from Mexico, he played no part in importing the drugs. He asserts that the plain language of § 2D1.1(b)(5) requires his "offense involve[] the importation of . . . methamphetamine." Appellant Br. at 20 (quoting § 2D1.1(b)(5)). The Eleventh Circuit previously addressed this issue in *United States v. Perez-Oliveros*, 479 F.3d 779 (11th Cir. 2007). A summary of the case is instructive.

In *Perez-Oliveros*, police pulled over the defendant as he drove through Mobile, and they found 30 kilograms of methamphetamine in his truck. *Perez-Oliveros*, 479 F.3d at 781. Evidence showed that the truck had recently crossed the border into the

United States. *Id.* At sentencing, the government conceded that the defendant did not drive the truck over the border but met it in San Antonio. *Id.* at 784. The district court nevertheless applied the importation enhancement to the defendant's sentence, which the defendant appealed. *Id.* at 783–84. On appeal, the defendant argued that the district court erred in applying the importation enhancement because no evidence showed that he participated in moving the drugs across the border. *Id.* at 784.

The Court rejected the defendant's argument that § 2D1.1(b)(5) applied "to only those defendants who themselves transport methamphetamine across the border." *Id.* The Court reasoned that the Sentencing Commission deliberately chose the "more inclusive language 'involved the importation,'" even though it could have used more restrictive language like it had in other subsections. *Id.*; *compare* U.S.S.G. § 2D1.1(b)(5) (applying enhancement if the offense "involved the importation of . . . methamphetamine"), *with* U.S.S.G. § 2D1.1(b)(3) (applying enhancement "[i]f the defendant unlawfully imported or exported a controlled substance"). The Court declined "to define the exact contours of what it means" to involve the importation of methamphetamine. *Perez-Oliveros*, 479 F.3d at 784. But it determined that the defendant's actions fell within the definition because "the importation was ongoing when [he] began driving the drug-laden truck in San Antonio." *Id.*

Applying the analysis from *Perez-Oliveros*, we think that Rivera-Fernandes's actions constituted the importation of

methamphetamine. Rivera-Fernandez got involved in the meth-amphetamine operation by calling a childhood acquaintance in Mexico and from that call understood he would be trafficking nar-cotics. Rivera-Fernandez then made several deliveries of metham-phetamine that came from Mexico. Thus, like the defendant in *Pe-rez-Oliveros,* Rivera-Fernandez helped transport methampheta-mine from Mexico to its final destination once it was in the United States. The fact that he did not personally move the methamphet-amine into the United States does not change the outcome because "the crime of importation does not end the moment the controlled substance enters the United States." *Id.*

Rivera-Fernandez argues that *Perez-Oliveros* differs from his case because he did not drive a truck containing methampheta-mine soon after it crossed the border. This is true, but Rivera-Fer-nandez took four kilograms of methamphetamine to a location set up by the supplier in Mexico to deliver it to a buyer. *Perez-Oliveros* makes clear that "importation 'is a continuous crime that is not complete until the controlled substance reaches its final destination point.'" *Id.* (quoting *United States v. Corbin,* 734 F.3d 643, 652 (11th Cir. 1984)). Rivera-Fernandez's actions partly facilitated the methamphetamine's movement from Mexico to its destination point. The district court did not err by concluding that Rivera-Fer-nandez's offense involved the importation of methamphetamine.

Alternatively, Rivera-Fernandez argues that the district court incorrectly applied the importation enhancement because the evidence did not show that he knew the drugs were imported.

As an initial matter, we have never held that § 2D1.1(b)(5) requires knowledge that the methamphetamine came from a foreign country. We need not decide that issue today because the district court had sufficient evidence to determine that Rivera-Fernandez had knowledge that the drugs came from Mexico. Rivera-Fernandez called a childhood acquaintance who he knew was in Mexico to get involved in the operation. There is also some evidence that he received multiple phone calls from the supplier in Mexico. From this evidence, we cannot say that the district court clearly erred in apply the importation enhancement.

## IV.    CONCLUSION

For these reasons, we affirm Rivera-Fernandez's sentence.

**AFFIRMED.**