**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

---

No. 00-30331

---

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

VERSUS

ANDRE GILLYARD,

Defendant-Appellant.

---

Appeal from the United States District Court
for the Western District of Louisiana

---

August 9, 2001

Before EMILIO M. GARZA, PARKER, and DENNIS, Circuit Judges.

DENNIS, Circuit Judge:

On May 18, 1999, a highway patrolman with the Texas Department of Safety, Bruce Dalme, stopped two vehicles traveling eastbound on Interstate 20 between Dallas/Fort Worth, Texas, and Shreveport, Louisiana, for following too closely behind an 18-wheeler. A red Chrysler Concorde, driven by Andre Gillyard's girlfriend Natasha Lawrence and in which Appellant Andre Gillyard was a passenger, followed the 18-wheeler two car lengths behind. Gillyard's

1

friends, Helen Guy, Tiffany Guy, and Princeston Parks, traveled one car length behind the Concorde in a Pontiac Grand Am. When Officer Dalme pulled behind the cars, the drivers decreased speed, increased intervals, and eventually stopped.

When the driver from the lead car exited the Concorde and approached the trooper, Gillyard slid into the driver's seat and sped off. Trooper Dalme pursued Gillyard for 32 miles and at speeds exceeding 120 miles per hour. According to the Pre-Sentencing Report, Gillyard "traveled through a one lane construction zone to move around other vehicles, struck another vehicle, drove onto the median causing construction workers to jump out of the way for their safety and continued driving erratically across the Louisiana state line." While two 18-wheelers were occupying both lanes, Gillyard passed them on the right shoulder and, in doing so, almost struck a Caddo Parish Sheriff's Office patrol car. Gillyard avoided the patrol car but caromed off a concrete piling instead. Gillyard exited the interstate in Shreveport, Louisiana, sped past a stopped school bus, ran stop signs in a residential neighborhood, and jumped from the car while it was in motion. Trooper Dalme finally apprehended Gillyard several blocks away and subsequently found approximately six bricks of powder cocaine in the trunk of his car.

Gillyard and Lawrence were charged in a two-count superseding indictment with conspiracy to possess cocaine hydrochloride with intent to distribute and possession of cocaine hydrochloride with

intent to distribute. Gillyard moved to suppress the cocaine and argued that the officer lacked probable cause to stop the car initially. The magistrate judge recommended that his motion be denied. Over Gillyard's objection, the district court adopted the magistrate judge's recommendation.

Gillyard conditionally pleaded guilty to both counts of the indictment but reserved his right to appeal the denial of his motion to suppress. The district court assessed a three-level enhancement under U.S.S.G. § 3A1.2(b) for assaulting a law enforcement officer and a two-level enhancement under § 3C1.2 for reckless endangerment of others during flight. Gillyard was sentenced to 240 months' imprisonment, five years' supervised release, and a $200 special assessment. Gillyard appealed. On appeal, Gillyard challenges the district court's denial of his motion to suppress and the district court's enhancement under the sentencing guidelines.

## I.    Motion to Suppress

Gillyard argues that the district court erred in not suppressing the cocaine found in the car because Trooper Dalme lacked probable cause to arrest him. Gillyard contends that the stop was a pretext to search for narcotics and suggests that Trooper Dalme's actions were motivated by racial animus or profiling; Gillyard states that Trooper Dalme was looking into cars

and that the "last vehicle stopped by Trooper Dalme four minutes earlier was also operated by a black person." Gillyard argues that Trooper Dalme's statement that the car was following too closely is contradicted by the affidavits and testimony of his three friends who witnessed the stop, Helen Guy, Tiffany Guy, and Princeston Parks. In addition, Gillyard contends that the video camera inside Trooper Dalme's car shows no evidence that the cars were following too closely. Gillyard entreats that the cocaine should be suppressed as fruit of an unlawful stop.

The district court, in denying the motion to suppress, explicitly credited Trooper Dalme's testimony over that of Gillyard's witnesses. In response to Gillyard's contention that the videotape showed a reasonable distance between the cars, the court concluded "[the video recorder] was clearly turned on after the Trooper had pulled into position behind the red Concorde" and accepted Trooper Dalme's explanation that the cars had dropped back as he approached.

"In reviewing a district court's ruling on a motion to suppress, we review questions of law *de novo*, and accept the trial court's factual findings unless they are clearly erroneous." United States v. Castro, 166 F.3d 728, 731 (5th Cir. 1999) (en banc) (citing United States v. Carrillo-Morales, 27 F.3d 1054, 1060-61 (5th Cir. 1994)). "We also view the relevant evidence in a light most favorable to the party that prevailed; in this case, the

4

government." Id. (citing United States v. Nichols, 142 F.3d 857, 866 (5th Cir. 1998)). "[W]hen a trial judge's finding is based on his decision to credit the testimony of one of two or more witnesses, each of whom has told a coherent and facially plausible story that is not contradicted by extrinsic evidence, that finding, if not internally inconsistent, can virtually never be clear error." Anderson v. City of Bessemer City, 470 U.S. 564, 575 (1985).

As both parties presented coherent and facially plausible stories, and as the district court's factual determination was based on its credibility assessment, to meet the clear error standard Gillyard must demonstrate that Dalme's statements were either internally inconsistent or contradicted by extrinsic evidence. Gillyard has not argued that Dalme's version of the events is internally inconsistent. He contends only that the video recording showing the cars to be a greater distance apart is extrinsic evidence that contradicts Dalme's story.

The district court explicitly found that the video camera was not turned on until after Dalme approached the cars and the cars fell back from the 18-wheeler. Gillyard does not challenge the district court's findings regarding when the video camera was turned on, and Gillyard's contention that turning on a video camera "is not an effort which requires a great passage of time" (implying that the camera should have been activated earlier) does not "clearly demonstrate that those findings were in fact wrong."

5

Castro, 166 F.3d at 733. The testimony of Gillyard's witnesses also does not demonstrate that the district court clearly erred in accepting Trooper Dalme's version of the events. When "there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." Anderson, 470 U.S. at 574.

Finally, Gillyard's argument that the stop was motivated by racial animus and was a pretext to search for narcotics is unavailing, as the subjective motivations of police are deemed irrelevant as long as their conduct does not exceed what they are objectively authorized to do. Whren v. United States, 517 U.S. 806, 814 (1996). Gillyard does not argue that following too closely is not a traffic violation under Texas law. Tex. Transp. Code § 545.062(a) (Vernon 1999) ("An operator shall, if following another vehicle, maintain an assured clear distance between the two vehicles so that, considering the speed of the vehicles, traffic, and the conditions of the highway, the operator can safely stop without colliding with the preceding vehicle or veering into another vehicle, object, or person on or near the highway."). And, he has presented no reasonable basis to challenge the district court's finding that a traffic violation was, in fact, committed by the driver of the Concorde. Thus, he has not shown that the stop of the Concorde violated the Fourth Amendment. Whren, 517 U.S. at 810 ("As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a

6

traffic violation has occurred.").

## II. Gillyard's Sentencing Enhancement

Gillyard also argues that the district court erred in assessing a three-level enhancement under U.S.S.G. § 3A1.2(b) for assault on a law enforcement officer and a two-level enhancement under § 3C1.2 for reckless endangerment during flight for the same high-speed car chase. The PSR recommended a three-level enhancement under § 3A1.2 because Gillyard's threatening conduct toward the officers was tantamount to aggravated assault against a law enforcement officer and a two-level enhancement under § 3C1.2 for recklessly endangering others (i.e., construction workers, school children, and other motorists) during the high-speed chase. Although the district court was initially "inclined to not do both," it later applied both enhancements. Gillyard argues that this assessment constitutes impermissible "double counting" that is explicitly prohibited by the Application Notes to § 3C1.2. See United States v. Morris, 131 F.3d 1136, 1140 (5th Cir. 1997) ("[D]ouble counting is prohibited only if the particular guidelines at issue forbid it.").

"This court reviews the sentencing court's application of the U.S.S.G. de novo, while reviewing the sentencing court's factual findings for clear error." United States v. Fitch, 137 F.3d 277, 281 (5th Cir. 1998) (citing United States v. Edwards, 65 F.3d 430,

7

432 (5th Cir. 1995)).  Section 3A1.2(b) provides for a three-level increase if "during the course of the offense or immediate flight therefrom, the defendant . . . assaulted [an] officer in a manner creating a substantial risk of serious bodily injury."  Section 3C1.2 requires a two-level increase "[i]f the defendant recklessly created a substantial risk of death or serious bodily injury to another person in the course of fleeing from a law enforcement officer."  Application note 1 to section 3C1.2 instructs that this enhancement should not be applied "where the offense guideline in Chapter Two, or another adjustment in Chapter Three, results in an equivalent or greater increase in offense level solely on the basis of the same conduct."  § 3C1.2, Application Note 1.

Gillyard contends that his conduct did not rise to the level of assault against officers.  Gillyard argues that the police were not endangered by his erratic driving and that he did not intentionally threaten them, but took evasive action to avoid striking the police car.  Moreover, Gillyard argues that his conduct did not create a "substantial" risk of death or serious bodily injury to others because he did not fire shots and because he stayed in the eastbound lane of the Interstate.  Gillyard also contends that applying both enhancements from  § 3A1.2 and § 3C1.2 constitutes impermissible double counting.

The PSR and the evidence are sufficient to support as not clearly erroneous the district court's evident factual findings that the high-speed chase endangered both police officers and

8

others. As the government contends, Gillyard "travelled through a one lane construction zone to move around other vehicles, struck another vehicle, drove onto the median causing construction workers to jump out of the way for their safety and continued driving erratically across the Louisiana state line." In addition, Gillyard's reckless driving in residential neighborhoods and disregard of stop signs and traffic lights endangered others. The PSR revealed that the defendant made threatening moves with his car towards the police vehicles and almost struck a Caddo Parish Sheriff's car. During the Sentencing Hearing, the district judge, after considering the statements in the PSR and viewing the videotape of the car chase, concluded that Gillyard placed numerous people in serious jeopardy and committed aggravated assault against law enforcement officers, and applied both enhancements. Because Gillyard has not shown that the district court's factual findings on these issues were clearly wrong, we will not disturb the court's judgment on these issues.

With respect to whether the two sentencing enhancements assessed by the district court under sections 3A1.2 and 3C1.2 constituted impermissible double counting, we have found no Fifth Circuit case squarely on point on both facts and law. The government cites other circuits' decisions discussing the application of sections 3A1.2(b) and 3C1.2 in which the defendant alleged double counting. Although most of the cases are distinguishable as they involve a combination of different kinds of

actions (i.e., firing a gun and leading police on a car chase),[1]
other cases bear on our analysis by analogy.

The courts that have addressed the issue of double
enhancements for different aspects of a criminal transaction have
focused on the temporal and spatial distinctiveness or separateness
of the acts in determining whether the defendant's conduct involves
more than one culpable act. United States v. Matos-Rodriquez, 188
F.3d 1300, 1312 (11th Cir. 1999).[2] Threats to police and to
bystanders that occur at different times and in different places
have been viewed as two separate acts worthy of two separate
enhancements under the guidelines. Matos-Rodriquez, 188 F.3d at
1312 (11th Cir. 1999). In Matos-Rodriquez, the court applied both

---

[1] See, e.g., United States v. Alicea, 205 F.3d 480, 486 (1st Cir.
2000) (concluding that a double enhancement under § 3A1.2(b) and §
3C1.2 for firing shots in an open plaza and firing a pistol at
police pursuing the defendant while fleeing the scene was not
impermissible double counting); United States v. White, 222 F.3d
363, 376 (7th Cir. 2000) (upholding the district court's enhancement
of the defendant's sentence under both § 3A1.2(b) and § 3C1.2 for
assaulting an officer with a gun before endangering others in a
flight from a bank); United States v. Swoape, 31 F.3d 482, 483 (7th
Cir. 1994)(applying both the enhancements in § 3A1.2(b) and § 3C1.2
because the defendant led the police on a chase endangering others
before shooting at and hitting a police officer); United States v.
Alexander, 48 F.3d 1477, 1492 (9th Cir. 1995) (applying both § 3C1.2
and § 3A1.2(b) because "the reckless endangerment provision applied
not only because shots were fired during the attempted getaway, but
also because of the risk of injury to civilians caused by the high-
speed chase and by the defendants' serious violations of other
traffic laws").

[2] But see United States v. Sloley, 19 F.3d 149, 154 (4th Cir.
1994) (stating, in dicta, that "[i]f both § 3A1.2(b) and § 3C1.2
apply to a defendant, the court must apply only the former and
increase the offense level by three levels") (citing U.S.S.G. §
3C1.2, comment 1).

enhancements because the defendant not only gunned the engine of his car, causing the police officer in front of the vehicle to push off in self-defense, but also sped away running stop signs and driving the wrong way on the street.  Id.  The court concluded that "Matos' conduct did not occur in a small area of only 'two or three car lengths,' or in a brief expanse of time.  Rather, Matos' assault of [the police] was separated temporally and spatially from his subsequent, reckless conduct in leading police officers on a high-speed chase.  The court concluded that this was not a single, uninterrupted event and that enhancements were not levied 'solely on the basis of the same conduct.'"  Id. ; see also United States v. Lowhorn, No. 99-6641, 2001 WL 303359, at *3 (6th Cir. Mar. 20, 2001) (unpublished)(holding that two adjustments for the defendant's conduct during a single car chase of accelerating toward a police road block and ignoring stop signs and traffic signals were permissible because they were "applied to address separate and distinct instances of harm caused by factually distinct actions by the defendant"); United States v. Kadunc, Nos. 99-3908 & 99-3909, 2001 WL 224002, at *5 (6th Cir. Feb. 27, 2001) (unpublished) (holding that enhancements under § 3A1.2(b) and § 3C1.2 are permissible as "the reckless endangerment of an unidentified motorist at the red light is separate and distinct [both temporally and geographically] from the vehicular assault on the FBI agent"); United States v. Miner, 108 F.3d 967, 970 (8th Cir. 1997) (holding that "the district court properly increased Miner's

11

offense level for assaulting a police officer when he rammed his car into a police roadblock, and for his chase-related conduct that created a risk of serious injury to other drivers and pedestrians"); United States v. Hernandez-Sandoval, 211 F.3d 1115, 1118 (9th Cir. 2000) (allowing a double enhancement under § 3A1.2(b) and § 3C1.1 and holding that the defendant's conduct of speeding through streets and ramming police cars "were . . . not only on independent actions but [perpetrated] on distinct victims").

On the other hand, threats to police and bystanders that happened in the same or nearby place and at the same time are viewed as one act deserving of only one enhancement. United States v. Hayes, 135 F.3d 435, 437 (6th Cir. 1998). In Hayes, 135 F.3d at 437, the Sixth Circuit concluded that punching a car's accelerator which resulted in injury to a law enforcement officer and endangerment of a child riding in the car was a "single, uninterrupted act." "To suggest that the conduct that caused the assault of [the officer] was different from that which placed the young child in danger would be 'an artificial and unrealistic division of a single uninterrupted course of conduct into separate events.'" Id. (quoting United States v. Beckner, 983 F.2d 1380, 1384 (6th Cir. 1983)); cf. United States v. Cabral-Castillo, 35 F.3d 182 (5th Cir. 1994) (disallowing a double enhancement under § 3C1.2 and § 2D1.1(b)(1) for reckless endangerment during flight and use of a deadly weapon (i.e., his car) when the defendant drove his car at a high speed toward a border patrol agent).

12

As in Matos-Rodriquez, Gillyard's acts of assault against a policeman and reckless endangerment of others were temporally and geographically separate. Although both occurred during the same car chase, both occurred at different times and in different places. Although the car chase jeopardized all in the vicinity, Gillyard's threats of force upon police occurred on the interstate and after his endangerment of the construction workers on the median. Similarly, the police endangerment occurred before Gillyard's violations of reckless driving, speeding, disobeying stop signs and signals, and illegally passing a school bus in a different vicinity. Gillyard's conduct is pertinently distinguishable from that in Hayes and in Cabral-Castillo. The threat in Hayes, although involving two victims, clearly involved one temporally and spatially unified action; the conduct in Cabral-Castillo involved only one threat to one victim. Because we find that Gillyard's conduct involved two temporally and geographically separate acts aimed at different victims, two enhancements were appropriate and not prohibited by comment 1 to § 3C1.2.

## III. Conclusion

For the foregoing reasons, the district court's denial of Gillyard's motion to suppress, its application of the sentencing guidelines, and the defendant's sentence are AFFIRMED.

13