# United States Court of Appeals
## For the First Circuit

No. 01-2612

PRISMA ZONA EXPLORATORIA DE PUERTO RICO, INC.,

Plaintiff, Appellant,

v.

HON. SILA MARIA CALDERON, personally and in her official capacity
as Governor of Puerto Rico and as President of the Children's
Trust Fund; JUAN AGOSTO-ALICEA, personally and in his official
capacity as President of the Government Development Bank of
Puerto Rico and as Vice-President of the Children's Trust Fund;
JORGE PESQUERA, personally; MILTON SEGARRA-PANCORBO, personally
and in his official capacity as Executive Director of the Puerto
Rico Tourism Company; JOSE V. PAGAN, personally and in his
official capacity as Executive Director of the Children's Trust
Fund; THE CHILDREN'S TRUST FUND; GOVERNMENT DEVELOPMENT BANK FOR
PUERTO RICO; JOHN DOE; GEORGE DOE 01CV1836; JANE DOE,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PUERTO RICO

[Hon. Juan M. Pérez-Giménez, U.S. District Judge]

Before

Boudin, Chief Judge,

Bownes, Senior Circuit Judge,

and Selya, Circuit Judge.

Luis G. Rullan-Marin with whom Zoraida Buxo-Santiago, Rullan
& Buxo, PSC, Jane Becker-Whitaker and Law Offices of Jane Becker
Whitaker, PSC were on brief for appellant.

Rafael Escalera-Rodriguez with whom Nestor J. Navas and Reichard & Escalera were on brief for institutional defendants.

Camella Fernandez-Romeu, Assistant Solicitor General, with whom Roberto J. Sanchez-Ramos, Solicitor General, and Vanessa Lugo Flores, Deputy Solicitor General, were on brief for individual defendants.

October 16, 2002

**BOUDIN**, **Chief Judge**.  Plaintiff Prisma Zona Exploratoria de Puerto Rico, Inc. ("Prisma Zona") sued the Children's Trust Fund of Puerto Rico (the "Trust Fund") and others (including several high officials in the Puerto Rican government) under 42 U.S.C. § 1983 (2000).  Prisma Zona claims that the defendants discriminated against it because of its affiliation with a rival political party, in violation of its rights under the First Amendment and to due process and equal protection.  The district court dismissed the suit under Rule 12(b)(6) for failure to state a claim.  Prisma Zona Exploratoria de P.R., Inc. v. Calderón, 162 F. Supp. 2d 1, 9-10 (D.P.R. 2001).  This appeal followed.

The background facts are largely uncontested.  For present purposes, we assume the truth of the allegations in the complaint and draw inferences in favor of the non-moving party, here Prisma Zona.  Aulson v. Blanchard, 83 F.3d 1, 3 (1st Cir. 1996).  However, we also draw where necessary upon undisputed documents that are in substance cross-referenced in the complaint. Watterson v. Page, 987 F.2d 1, 3-4 (1st Cir. 1993); accord Beddall v. State St. Bank & Trust Co., 137 F.3d 12, 16-17 (1st Cir. 1998). At oral argument, both sides said that the case could be treated as one for summary judgment.

In January 1999, then Governor Pedro Rosselló of Puerto Rico, a member of the New Progressive Party ("NPP"), announced a plan to create a children's museum in Puerto Rico.  The museum,

-3-

modeled on similar initiatives in Boston and elsewhere, was to include interactive exhibits, a theater and other attractions. It was to be built and operated using a portion of Puerto Rico's share of the master tobacco settlement of November 1998.

In April 1999, the Tourism Company, a state agency, created a public corporation, Prisma El Exploratorio, Inc. ("Exploratorio"), to develop the preliminary phase of the children's museum. Prisma Zona says the plan was eventually to turn over ownership and control of the museum to a private non-profit entity to free it from "political partisanship." The following month Exploratorio secured a $20 million line of credit with the Government Development Bank (the "Bank")--another state entity--to help pay for the design and construction of the museum facilities; the line of credit was to be repaid using the tobacco settlement proceeds. Ground breaking for the museum was held on October 7, 1999.

On July 30, 1999, Puerto Rico created the Children's Trust Fund, a public corporation, and assigned to it Puerto Rico's share of the tobacco settlement. Act No. 173 of July 30, 1999 (codified at 24 LPRA § 3121 et seq. (2002)). The statute created a board of directors for the Trust Fund, consisting of four ex officio members (the Governor, the Secretary of Justice, the President of the Bank, and the Director of the Office of Management and Budget) and three private persons appointed by the Governor,

and gave it broad authority to allocate trust funds to improve the welfare of Puerto Rico's children.  Id. §§ 4-5.  The Bank provides all of the Trust Fund's staffing, conducts its day-to-day management, and serves as its disbursement agent and financial advisor.  Id. §§ 12, 14.

On September 29, 1999, the Trust Fund board adopted regulations, pursuant to its statutory authority, establishing requirements for the receipt and use of trust funds.  In addition, the board approved Exploratorio's request for up to $60 million to cover museum expenses.  Prisma Zona says the board also resolved to transfer the grant to the private entity that would eventually succeed to the project.

Earlier in that same month, several private citizens formed Prisma Zona Exploratoria de Puerto Rico, Inc. ("Prisma Zona"), the plaintiff in this action, to take over the construction, ownership, and operation of the children's museum. The company's founders and management had close ties to the NPP and its board of directors was selected by Governor Rosselló.  The present case revolves around this new entity's effort to secure control over the children's museum and its funds and the rebuff of those efforts by a new administration under a different party.

In May 2000, Prisma Zona began negotiations with the Tourism Company and its subsidiary Exploratorio to acquire the museum assets and to assume the responsibility for its development.

On June 16, 2000, it requested $60 million from the Trust Fund to pay for the museum assets and to complete its construction and an additional $17.5 million to operate it for three years. The Trust Fund board approved Prisma Zona's requests on August 30, 2000. That day, Governor Rosselló (as president of the Trust Fund board) sent Prisma Zona a letter informing it of the board's approval but noting additional required steps, including review of Prisma Zona's budget and finalization of a contract containing "details on the procedures for the disbursement of funds."

On November 15, 2000, the Trust Fund issued $400 million in bonds to fund its projects and transferred nearly $10 million to the Bank to cancel Exploratorio's outstanding line of credit. Both the Trust Fund and the Bank (which managed the bond sale) represented in various documents (including a prospectus, tax certificate, and bond contract) that a portion of the bond sale proceeds would be used for the "acquisition, construction, and equipping of a children's museum . . . in Isla Grande, Santurce, Puerto Rico, to be owned and operated by [Prisma Zona]."

On November 29, 2000, Prisma Zona reached an understanding with the Tourism Company and Exploratorio to acquire the museum project (the "Transfer Agreement"). The following month Prisma Zona began negotiating a service contract with the Trust Fund. The Trust Fund prepared two form contracts (one each for the capital and operational grants) and sent them to Prisma Zona for

its review on December 28, 2000. Prisma Zona says it made only "minor" changes to these documents before faxing them back to the Trust Fund the same day. The Trust Fund never responded. Nonetheless, Prisma Zona alleges that at this time "the parties had agreed to the terms of the [service contracts] and the only action needed was the non-discretionary ministerial act of signing the agreement."

As these events were unfolding, Puerto Rico was holding its 2000 elections. During the campaign for Governor, Sila Calderón, the Popular Democratic Party ("PDP") candidate, promised to investigate a number of Rosselló administration projects, including the children's museum, for corruption and misuse of public monies. Calderón defeated the NPP candidate at the polls on November 7, 2000, and took office on January 2, 2001.

In its subsequent complaint Prisma Zona alleged that from the outset the new PDP administration attempted to undermine Prisma Zona's role in the museum project because of its ties to NPP and former Governor Rosselló. In particular, Prisma Zona said the Bank (as the Trust Fund's disbursement agent) has refused to pay museum invoices that Prisma Zona has submitted since January 2001 and that the Bank subjected it to a sham audit. Prisma Zona also alleged that in May 2001, the Tourism Company filed a "frivolous" suit in commonwealth court, seeking to invalidate the Transfer Agreement. (Thereafter the Puerto Rico Superior Court declared the Transfer

Agreement void under Puerto Rico law. Compañía de Turismo de Puerto Rico v. Prisma Zona Exploratoria de PR Inc., KAC2001-3380 (506) (April 4, 2002).)

Prisma Zona filed this civil rights action in district court on June 22, 2001, naming as defendants the Trust Fund, the Bank and various individuals in the Calderón administration.[1] Prisma Zona says defendants' refusal to carry through with the transfer of assets and funding was motivated by Prisma Zona's political ties and violated its First Amendment, due process, and equal protection rights. For relief, Prisma Zona seeks imposition of a constructive trust, disbursement of the trust funds, a generally phrased injunction against the alleged harassment, and punitive damages. After limited discovery, the district court dismissed the suit under Rule 12(b)(6). Prisma Zona, 162 F. Supp. 2d at 9-10.

The district court ruled that Prisma Zona did not have a binding contract with the Trust Fund obligating it to fund Prisma Zona. Prisma Zona, 162 F. Supp. 2d at 4. The court further held that absent such a contract or its effective equivalent (e.g., an

_____

[1]The individual defendants include Sila Calderón, the Governor of Puerto Rico and president of the Trust Fund's board; Juan Agosto Alicea, president of the Bank and vice-president of the Trust Fund's board; José V. Pagán, vice-president of the Bank and executive director of the Trust Fund; Jorge Pesquera, the executive director of the Tourism Company until June 30, 2001; and Milton Segarra Pancorbo, the current executive director of the Tourism Company.

ongoing commercial relationship), the Trust Fund was free not to contract with Prisma Zona even if political motives prompted that decision.  Id. at 7-8.  Finally, the court said that even if First Amendment precedents were extended to cover new entities seeking to contract, the defendants had a so-called Mount Healthy defense because they would for independent reasons have refused to disburse the funds.  Id. at 8; see Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287 (1977).

The legal landscape for Prisma Zona's First Amendment claim is a set of Supreme Court decisions starting in the 1970s. Politically motivated hiring, firing and contracting by governments has a long history in the United States; civil service reform statutes are largely a response to this tradition.  But beginning with Elrod v. Burns, 427 U.S. 347 (1976), the Supreme Court has added a new layer of protection based on First Amendment grounds. See also Rutan v. Republican Party of Ill., 497 U.S. 62 (1990); Branti v. Finkel, 445 U.S. 507 (1980).  How far that protection extends, often a debatable matter, is an issue of law which we review de novo.

Prisma Zona claims that a completed contract exists between it and the Trust Fund.  Although a binding contract is not necessarily a condition of First Amendment protection, it would give Prisma Zona a much firmer basis in Supreme Court precedent to argue that it was protected from a politically motivated refusal to

deal, see, e.g., Bd. of County Comm'rs v. Umbehr, 518 U.S. 668, 685 (1996), quite apart from its use as an independent basis for relief under local law.  We accordingly begin with that question here.

In a nutshell, Prisma Zona applied to the Trust Fund for funding to buy the museum assets, complete construction and operate the project for three years.  The Trust Fund's president--then Governor Rosselló--responded on August 30, 2000, that the board had "favorably considered your proposed initiative," but his letter continued:

> The granting of Assistance Service [i.e., funding] is subject to a review of the budget and the details of the initiative.  Prior to receiving the funds requested, you must meet with the Officers of the Trust to . . . [verify information and budget] and to finalize the Contract of Assistance Service.  The contract must contain details on the procedures for the disbursement of funds.

The letter set forth other conditions that would govern the grant and said that if Prisma Zona indicated its agreement, the Trust Fund would arrange for a further meeting.

Prisma Zona indicated its agreement and in December the parties moved toward adoption of two detailed "service" contracts, one to fund capital commitments and the other for operating expenses.  (From the government's standpoint, a private provider such as Prisma Zona agrees to provide services in exchange for the grant.)  However, the Trust Fund's drafts were delivered only on December 28, 2000, they were returned with suggested changes by

-10-

Prisma Zona, and no final service contracts were signed.  Instead, on January 2, 2001, a new administration took power in Puerto Rico and the Trust Fund declined to proceed.

On this appeal, Prisma Zona says that the original August 30 letter and its acceptance constituted a binding contract promising funding, that this contract was not "conditioned" on the adoption of service contracts, and in any event the latter were virtually complete by the end of December save for a few details that were not "material."  Prisma Zona argues that under Puerto Rico law, contract formation is a question of fact, turning on the intent of the parties, and at the very least the fact question could not be resolved on a motion to dismiss but entitled Prisma Zona to a jury trial.

Whether or not one calls the August 30 letter and reply a "contract," the critical question (given the relief sought) is whether the Trust Fund ever assumed a binding obligation to make grants to Prisma Zona.  As to this, the August 30 letter is explicit on its face: that--other conditions aside--no funds could be provided until the parties had "finalized" the service contracts.  Further, as the district court pointed out, the Trust Fund's own formal regulations provide that "[a] service contract will be entered into between the Trust Fund and the beneficiary entity" and set forth issues that had to be addressed (e.g., "specific clauses delineating the responsibilities of the

-11-

parties").  Prisma Zona, 162 F. Supp. 2d at 4; accord Regulations for the Requisites of Eligibility and the Criteria for Statutory Monitoring under the Statute for the Children's Fund, art. 5(c) ("Trust Fund Regulations").

Alternatively, Prisma Zona suggests that the letter and reply were "a contract to make a contract."  This assumes, as we will do at this stage, that Prisma Zona could develop factual evidence of such an intent on both sides.  But even if (assuming further) this theory is allowable despite the Trust Fund Regulations just quoted--and this is far from clear--a contract to make a contract is enforceable only where all material terms have been agreed upon.  1 Corbin, Contracts, § 2.8, at 131, 133-34 (Perillo ed. 1993).  Prisma Zona's own statements, and the service contract drafts which it attaches, show that material issues were still open.

Most obviously, the service contract drafts left blank a number of important terms, such as the amount of the grant.  In addition, in returning the service contract drafts with proposed changes, Prisma Zona asked for a number of substantive changes.  It wanted to limit the Trust Fund's ability to terminate the grant for cause to an exercise of reasonable discretion.  The Trust Fund drafts required Prisma Zona to indemnify the Trust Fund for legal expenses arising out of the grant--hardly a trivial matter, as this case illustrates.  In response, Prisma Zona's mark-ups required the

Trust Fund to use the government's legal representation before incurring separate expenses that Prisma Zona would have to cover. Parties still short of agreement as to such substantive terms have not completed their bargaining.

Nor is Prisma Zona's position helped by the surrounding circumstances that it says bear out the claim of an existing contract. For example, the bond prospectus apparently said that funds would go to Prisma Zona to operate the museum; but--whatever the securities law implications--this is a statement as to what was intended, not a statement that the necessary contracts had already been negotiated. Similarly, Prisma Zona says that the Trust Fund in fact paid out almost $10 million for Prisma Zona's acquisition of the museum, but this appears to have been an intra-governmental payment from the Trust Fund to the Tourism Company to reimburse it for funding the museum's initial investment.

All such events show is what is already conceded, namely, that the Rosselló administration intended that the various agencies involved cooperate to transfer the museum and additional funding to Prisma Zona. Indeed, the process was not only intended, but steps just short of a final legal commitment continued even after the November 2000 election. Nevertheless, the service contracts were not completed, let alone signed, before the new administration took

office in January 2001. Thus, there was no binding legal obligation to fund Prisma Zona.[2]

Prisma Zona has another string to its bow. It says that it need not have a right to a benefit (in this case, the contractual right to funding) to be protected under the First Amendment against a politically motivated denial of that benefit. As an abstraction, this is so: several early cases involved political firings of low-level employees who lacked civil service or contract protection. Branti, 445 U.S. at 515; Elrod, 427 U.S. at 350-51 (plurality opinion). Today's protection also extends beyond discharging current employees to employee hiring and promotion decisions. Rutan, 497 U.S. at 79.

Although current or would-be employees have been specially favored, the Court has also afforded some protection to businesses that deal with the government, O'Hare Truck Serv., Inc. v. City of Northlake, 518 U.S. 712, 714-15 (1996) (removal from list of private towing services); Umbehr, 518 U.S. at 686 (non-renewal of trash hauling contract), although here the coverage is

---

[2]Prisma Zona also asks us to imply equitably a quasi-contract or constructive trust between it and the Trust Fund. We decline, not only because the theory is only adverted to perfunctorily on appeal, United States v. Zannino, 895 F.2d 1, 17 (1st Cir.), cert. denied 494 U.S. 1082 (1990), but also because its argument fails entirely to demonstrate the unjust enrichment that would invoke this court's equitable powers, see Corporación Insular de Seguros v. Reyes Munoz, 849 F. Supp. 126, 135 (D.P.R. 1994) (discussing the requirements of constructive trust under both Puerto Rican and general contract law).

less certain once one goes beyond existing commercial relationships, see id. at 685. The next area of contest appears to revolve around those who wish for the first time to bid for government contracts. On this issue, the Supreme Court has not yet spoken definitively, and the circuits appear to be divided.[3]

Happily, such large questions as to whether the Elrod line will continue to expand need not be decided to dispose of this case. We will assume, purely arguendo, that a state government could not invite bids to supply pencils to the state with the caveat that no company headed by a Democrat could apply. Further, at this stage of fact development, Prisma Zona is entitled to the assumption--which may or may not be correct--that party politics played a role in the Calderón administration's refusal to make the previously intended grant.

Nevertheless, whatever may be true of pencil contracts, we decline to hold that the First Amendment requires politically immaculate state decision-making in cases like this. Even in core cases involving politically motivated hirings and firings, the Supreme Court has itself recognized that a wholly antiseptic application of the Elrod principle is unrealistic. Instead, party

---

[3]See, e.g. Lucas v. Monroe County, 203 F.3d 964, 972 (6th Cir. 2000) (tow truck operator who had never been called was protected from removal from the call list), McClintock v. Eichelberger, 169 F.3d 812, 817 (3d Cir.) (limiting Umbehr and O'Hare to ongoing commercial relationships), cert. denied, 528 U.S. 876 (1999); Tarpley v. Jeffers, 96 F.3d 921, 924 (7th Cir. 1996) ("The First Amendment bars patronage hiring of independent contractors.").

affiliation is an appropriate consideration in hiring and firing decisions with respect to government positions that may be characterized as "policymaking" or "confidential."  Branti, 445 U.S. at 517-18; see also Durieux-Gauthier v. Lopez-Nieves, 274 F.3d 4, 9-10 (1st Cir. 2001); cf. Walker v. City of Lakewood, 272 F.3d 1114, 1132 (9th Cir. 2001), cert. denied, 122 S. Ct. 1607 (2002).

Here, Prisma seeks to attack a set of decisions related to the possible privatization (whether to do so and through whom) of the operation of a children's museum and directing to it millions of dollars of public monies.  Where policy choices of this magnitude are presented, courts ought not be second-guessing how much party politics in the narrower sense may also have played a role.  Cf. Bogan v. Scott-Harris, 523 U.S. 44, 54-55 (1998).  If political considerations are permissible in the hiring and firing of upper-level government employees, surely they are also appropriate in a case like this one.

Imagine that the President of the United States were considering whether a new federally supported billion-dollar pipeline were to run through one state or another. Numerous policy and technical arguments exist on both sides; it also happens that one state supported the President in the last election and the other did not.  Only an extreme enthusiast could suppose that the First Amendment would license an inquisition into the question whether politics played some part in the deliberations.  Firing a

-16-

street sweeper who voted for the loser is one thing; turning over a publicly funded $70 million museum to the opposition party is quite another.

Prisma Zona asserts that even without a contract its interest goes beyond that of a mere job applicant or contract bidder. It says that it has started a relationship with the Trust Fund and has committed substantial resources to the endeavor, reasonably anticipating that it would receive the grant. But the concern that underlies the exception as to policymaking functions-- and which we apply here by analogy--is not limited to new applicants. Policymakers can be replaced, despite reliance, absent legal tenure or contract.

If the complaint's facts are assumed as true, it is at least likely that Prisma Zona's own selection as the prospective grantee under the NPP administration--and perhaps the decision to privatize the museum in the first place--was not uninfluenced by party politics. Prisma Zona seems to think that this is fine for selection but not for de-selection. Others might think that turn-about is fair play. Our own concern is exhausted by finding that Prisma Zona has not set forth a First Amendment violation even if the facts are as alleged.

Prisma Zona makes three other constitutional claims, none of which requires much discussion. First, it says that its efforts to secure and its expectation of receiving the grant funds

constituted a property interest, which would at least qualify for protection under Puerto Rico statutes related to quasi-contract and constructive trust, and that this interest in turn is protected against impairment by the Due Process Clause.  Prisma Zona makes no serious effort to establish that either state-law doctrine applies on the facts of this case.  Mass. Sch. of Law v. Am. Bar Ass'n, 142 F.3d 26, 43 (1st Cir. 1998) (undeveloped arguments are deemed abandoned).

Next, in two paragraphs, Prisma Zona says that its right to procedural due process was violated because it was denied "some kind of hearing."  See, e.g., United States v. Fla. East Coast Ry. Co., 410 U.S. 224, 239 & n.7 (1973).  Prisma Zona appears (the argument is quite unclear) to be claiming that it was entitled to make some kind of presentation to the Trust Fund before the grant was set aside.  But its brief is silent about its efforts to secure a hearing, what it wanted to demonstrate at such a hearing, and what purpose a hearing would have served.  Again, the argument is not seriously developed and we mention it only to say that it has not been overlooked.

Finally, Prisma Zona relies upon equal protection principles.  It says that other grants made by the Trust Fund were carried out and that the refusal to complete the grants to Prisma Zona was an irrational discrimination motivated solely by political affiliation.  To the extent that this claim pretends to be anything

more than a restatement of the failed First Amendment claim, it too is undeveloped and abandoned.  Prisma Zona does not point to any similarly situated grantee, let alone a context so similar to this one as to suggest that it was irrational to treat that grantee and Prisma Zona differently.

Our conclusion that Prisma Zona has failed to state a claim under section 1983 makes it unnecessary for us to address the remaining issues noted by the parties: these include the district court's finding of a <u>Mount Healthy</u> defense (which Prisma Zona attacks), <u>Prisma Zona</u>, 162 F. Supp. 2d at 8; 11th amendment and qualified immunity claims (presented by some of the defendants as an alternative ground for affirmance); and the significance of the intervening decision of the Puerto Rico Superior Court, discussed above, invalidating as <u>ultra vires</u> the original decision by the Tourism Company and Exploratorio to empower Prisma Zona to operate the children's museum, <u>Compañía de Turismo</u>, KAC2001-3380 (506).

<u>Affirmed</u>.