# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

March 4, 2013

No. 11-11228

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

Plaintiff–Appellee

v.

CHRISTIAN ALEXANDER WALLSTRUM,

Defendant–Appellant

consolidated with 11-11230

UNITED STATES OF AMERICA,

Plaintiff–Appellee

v.

DANE TAYLOR CLARK,

Defendant–Appellant

consolidated with 11-11231

UNITED STATES OF AMERICA,

Plaintiff–Appellee

v.

REED BECKER BRYANT,

Defendant–Appellant

Appeals from the United States District Court
for the Northern District of Texas
(11-CR-26)

No. 11-11228

Before REAVLEY, PRADO, and ELROD, Circuit Judges.

PER CURIAM:[*]

Defendant–Appellants Christian Alexander Wallstrum, Dane Taylor Clark, and Reed Becker Bryant appeal the denial of their motions to suppress evidence seized during two traffic stops. For the reasons given below, we AFFIRM the judgment of the district court.

## Background

*A.     Wallstrum Stop*

Shortly after 6:00 p.m. on February 5, 2011, Texas Department of Public Safety ("DPS") Trooper Ben Dollar was patrolling Interstate 40 in Carson County, Texas when he observed three vehicles traveling closely together: an SUV, a white Toyota Camry, and a silver Ford Fusion. Believing that the Camry was following the SUV too closely, Trooper Dollar initiated a traffic stop. Defendant–Appellant Wallstrum was renting the Camry at the time. When Wallstrum pulled over, Trooper Dollar approached from the passenger side, explained the reason for the stop, and asked for his license and registration. During this exchange, Trooper Dollar noticed several food and drink containers in the car as well as a receipt for a Gallup, New Mexico hotel. Wallstrum provided the requested materials along with the car rental agreement. Trooper Dollar indicated that he would give Wallstrum a warning and asked Wallstrum to accompany him back to the patrol car.

In the patrol car, Trooper Dollar questioned Wallstrum about his travel while he waited for the results of the computer checks he was running on Wallstrum's information. Wallstrum stated that he started his trip in Dallas, flew back to Oklahoma City, and was now headed to North Carolina. This

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

intrigued Trooper Dollar because both Dallas and Oklahoma City were east of where the traffic stop occurred, indicating that Wallstrum had to have also traveled west at some point given their current location. As Trooper Dollar continued his questioning, Wallstrum became flustered such that his arms and hands were shaking, his eye was twitching, and his carotid artery was visibly pulsing. Wallstrum explained that he had also gone to Amarillo to visit a girlfriend and was currently on his way from Amarillo to North Carolina. Suspecting that Wallstrum was being dishonest, Trooper Dollar asked if Amarillo was as far west as Wallstrum had traveled. When Wallstrum indicated that it was, Trooper Dollar became concerned because he remembered seeing the receipt for the New Mexico hotel in the car. Trooper Dollar also noticed that the car rental agreement was expired because the car should have been returned to Oklahoma City three days earlier.

At that point, the computer checks cleared, and Trooper Dollar gave Wallstrum a warning for following too closely and returned all of Wallstrum's documents. Trooper Dollar then asked Wallstrum if he was carrying or transporting any weapons or controlled substances; Wallstrum said that he was not. Trooper Dollar requested consent to search the car and Wallstrum agreed. Trooper Dollar searched the car for approximately thirty minutes and noticed several areas where the vehicle had been altered. The fuel sending unit in the car appeared to have been taken apart, and it appeared as though the front bumper and rocker panels had been removed recently. When Trooper Dollar indicated that he wished to continue the search at the DPS office, Wallstrum again agreed. At the DPS office, Trooper Dollar removed the rocker panels and discovered twenty-four bundles of cocaine. Wallstrum was placed under arrest and later told the arresting officers that he had met Defendant–Appellant Bryant and Defendant–Appellant Clark at a Gallup, New Mexico hotel and that they had instructed him to drive to North Carolina.

*B.     Bryant and Clark Stop*

Around the time that Trooper Dollar first noticed the three vehicles, Trooper Brandon Riefers was stopped in the same area of Interstate 40, assisting another trooper. From his patrol car, Trooper Riefers observed the same three cars and determined that the group was traveling too closely together. Trooper Riefers pursued the silver Ford Fusion, which was being driven by Bryant with Clark as his passenger, and initiated a traffic stop. Trooper Riefers approached the vehicle from the passenger side and requested Bryant's license and insurance, which Bryant supplied. Clark informed Trooper Riefers that the car was a rental and handed him the rental agreement as well. Trooper Riefers then told Bryant that he would be giving him a warning and asked Bryant to exit the vehicle.

When Bryant exited the vehicle, Trooper Riefers requested Clark's driver's license and began questioning him about their travel plans. Clark told Trooper Riefers that they were traveling to Fort Worth for a super bowl party and would be staying in the Dallas/Fort Worth area until the rental agreement expired. During this conversation, Trooper Riefers noticed energy drinks, bottles of water, and snack items inside the car, which he believed indicated "hard" travel. Trooper Riefers then returned to his patrol car to run checks on the information provided to him and had Bryant join him in the front seat.

While Trooper Riefers verified the information, he began questioning Bryant. Bryant told him that they had come from Albuquerque and were traveling to Charlotte, North Carolina to stay with his uncle before returning to Arizona. Bryant never mentioned going to Dallas or Fort Worth. At this point, Trooper Riefers became suspicious because Bryant and Clark had such differing stories. He also found the rental agreement to be suspicious. The agreement was issued to Victoria Teague, Clark's girlfriend, and indicated in typed font that no other drivers were permitted, but "Dane Clark additional driver OK" was

handwritten in a different section. Additionally, Trooper Riefers noticed that the rental agreement indicated that the car was to stay within Arizona, California, New Mexico, and Texas, which would mean that a trip to North Carolina would not be covered.

After about five minutes of questioning during the computer check, Trooper Riefers returned Bryant's driver's license and the papers for the car and then issued the warning for following too closely. As Bryant started to open the patrol car door to leave, Trooper Riefers asked him if he was carrying any weapons in the vehicle or anything illegal. Bryant said that he was not but began exhibiting signs of extreme nervousness, including his arms and hands shaking, his cheeks twitching underneath his eyes, and his neck visibly pulsing. Trooper Riefers then asked if he could search the car, and Bryant gave him permission. Trooper Riefers asked Clark to exit the vehicle and stand in the ditch along with Bryant. He instructed the two not to talk to each other and began searching the car.[1]

During the search, Trooper Riefers noticed tool marks on a clip located where the windshield wiper blades sit (the front cowl), and believed this to indicate that someone had tampered with the area because the piece appeared to have been lifted up. Because he did not have the tools or ability to access that area, he decided that he would need to take the car to the DPS office for further inspection. Regarding the water bottles, snacks, and energy drinks that he had previously noticed, Trooper Riefers found it suspicious that he did not find any receipts for the goods. This furthered his suspicion that the two men were traveling with someone else. Trooper Riefers also discovered a black "Jeep" bag in the trunk, which belonged to Bryant. Inside the bag were loose grommets and screws.

---

[1] Trooper Riefers began the search approximately thirteen minutes after the stop.

No. 11-11228

Trooper Riefers had been searching the vehicle for approximately thirty minutes when Officer Dawson came to the scene to assist with the search. Officer Dawson had been assisting Trooper Dollar and informed Trooper Riefers that the driver of the other vehicle indicated that he was traveling to North Carolina. This led Trooper Riefers to believe that the cars were traveling together. He then put the luggage back in the car and indicated to Bryant that he wanted Bryant to follow him to the DPS office to continue the search, and Bryant agreed to go. Trooper Riefers then had Clark join him in the front seat of the patrol car and the group went to the DPS office.[2]

When they arrived at the DPS office, Trooper Dollar was already there searching Wallstrum's Camry up on a lift. Shortly thereafter, the cocaine was found in the Camry. No drugs were found in Bryant's car, but the officers inspected the compartment where the drugs were hidden in the Camry and determined that the screws and grommets observed in Bryant's bag came from that area. The grommets and screws were similar in shape and size and were the exact same number as those missing from the Camry. At that point, Bryant and Clark were arrested.

In June 2011, a grand jury charged Bryant, Clark, and Wallstrum with one count of conspiracy to possess cocaine with intent to distribute and one count of possession with intent to distribute. Each defendant filed a motion to suppress, but the district court adopted the magistrate judge's report and recommendation and denied the motions. The defendants then pleaded guilty to the conspiracy count but reserved their right to appeal the suppression rulings, which they do now.

---

[2] Trooper Riefers testified that he separated Bryant and Clark for safety reasons and that it was normal policy to do so because it prevented the two from discussing what they had told the officers.

No. 11-11228

**Discussion**

To assess a district court's denial of a motion to suppress, we review findings of fact for clear error and conclusions of law de novo. *United States v. Jenson*, 462 F.3d 399, 403 (5th Cir. 2006). We also construe the evidence in the light most favorable to the "party that prevailed in the district court." *United States v. Jones*, 234 F.3d 234, 239 (5th Cir. 2000). If the trial judge's finding is based on the "decision to credit the testimony of one of two or more witnesses, each of whom has told a coherent and facially plausible story that is not contradicted by extrinsic evidence, that finding, if not internally inconsistent, can virtually never be clear error." *United States v. Gillyard*, 261 F.3d 506, 509 (5th Cir. 2001) (citing *Anderson v. City of Bessemer City*, 470 U.S. 564, 575 (1985)). We may affirm the district court's decision on any basis established by the record. *United States v. Pack*, 612 F.3d 341, 347 (5th Cir. 2010), *modified on other grounds*, 622 F.3d 383 (5th Cir. 2010).

A.     *Initial Stops*

Traffic stops constitute a "seizure" within the meaning of the Fourth Amendment. *United States v. Brigham*, 382 F.3d 500, 506 (5th Cir. 2004) (en banc). To determine whether such a seizure is reasonable we consider (1) "whether the officer's action was justified at its inception," and (2) "whether the officer's subsequent actions were reasonably related in scope to the circumstances that justified the stop." *Id.* A traffic stop is justified at its inception if an officer has "an objectively reasonable suspicion that some sort of illegal activity, such as a traffic violation, occurred, or is about to occur, before stopping the vehicle." *United States v. Banuelos–Romero*, 597 F.3d 763, 766 (5th Cir. 2010) (quoting *United States v. Lopez–Moreno*, 420 F.3d 420, 430 (5th Cir. 2005)). Thus, if the officer "can point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the search and seizure, the intrusion is lawful." *United States v. Santiago*, 310 F.3d

No. 11-11228

336, 340 (5th Cir. 2002) (internal quotation marks and alterations omitted). This analysis "is necessarily fact-specific, and factors which by themselves may appear innocent, may in the aggregate rise to the level of reasonable suspicion." *Id.*

Here, the defendants argue that the initial stops by Trooper Dollar and Trooper Riefers were both unlawful because neither Wallstrum nor Bryant committed the offense of following too closely as defined by state law.[3]  As support, the defendants point to the testimony of their two expert witnesses: Cam Cope and Billy Teague.

Cope, an expert in forensic accident reconstruction, and Teague, a retired law enforcement officer and former DPS Academy instructor, both relied on a video taken from Trooper Riefers's patrol car that revealed the cars traveling down the highway shortly before Bryant was stopped. Based on his observations of the video, Cope testified that there was a distance of sixty to eighty feet between Wallstrum and Bryant's car and that there was a slightly greater distance between Wallstrum and the SUV. Cope suggested that the vehicles were slowing down at the time because they were passing the traffic stop that Trooper Riefers was assisting on and opined that Bryant and Wallstrum were operating at a safe distance. Teague testified that after he viewed the video and applied the methods he had previously taught for determining distance, he determined that the cars were operating at a safe distance. Teague explained that troopers are taught to use reference points and also to verbally count "one

---

[3] Texas Transportation Code section 545.062 provides as follows:

An operator shall, if following another vehicle, maintain an assured clear distance between the two vehicles so that, considering the speed of the vehicles, traffic, and the conditions of the highway, the operator can safely stop without colliding with the preceding vehicle or veering into another vehicle, object, or person on or near the highway.

Tex. Transp. Code § 545.062(a).

8

one thousand," "two one thousand," to determine distance behind another vehicle.

Trooper Dollar and Trooper Riefers offered their own description of the events. Trooper Dollar testified that it was a clear day when the stop occurred and that the three vehicles caught his eye because "the two passenger cars behind were []way too close for safety." He stated that troopers are "trained day in and day out to look for traffic violations" and that following too closely was one such violation. To determine whether a car is following too closely, Trooper Dollar testified that he looks for a safe distance and also takes "into consideration the speed of that vehicle." Because the three cars were traveling at highway speed, he determined that the space was too close for safety because they would not have been able to stop in time if there was a threat or if the car in front of them stopped. Trooper Dollar would not put a number on the distance between the cars but answered one inquiry by stating that it was closer to one hundred feet apart than ten feet apart.

To support his stop, Trooper Riefers testified that the speed limit on Interstate 40 at that location was seventy miles per hour. When he saw the three cars pass, he determined that they were too close because "traveling at the speed limit," they would not have been able to avoid a collision with the front vehicle. He further testified that there was "not enough room that another vehicle could safely occupy the space between them." On cross-examination, Trooper Riefers testified that the video of the stop showed that there was a distance of sixty to ninety feet between the cars, which was about two or three highway dash marks. He explained that a safe distance for traveling at seventy miles per hour would be approximately three hundred feet because a normal reaction time for a vehicle to stop is about "a second and a half" and, "[a]t 70 miles an hour, a second and a half is 150 feet."

9

No. 11-11228

In analyzing the different stories offered, the magistrate judge credited the troopers' testimony over that of the defendants' witnesses. The magistrate judge noted that the video was not necessarily probative of the events because the troopers' observations were not confined to what the camera recorded. Nevertheless, the magistrate judge determined that even if the video were relied upon, the defendant's expert witness testimony was contradicted by the time counter accompanying the patrol car recording. Teague had testified that troopers are taught to count two seconds to determine a safe distance between cars, but the magistrate judge determined that the counter unquestionably showed that the cars were not separated by two seconds. When each car passed in front of a fixed reference point, only one second passed on the counter before the next car came. The magistrate judge determined that this video evidence confirmed Trooper Riefers testimony and also lent credibility to Trooper Dollar's "scant testimony."[4]

Both the Government and the defendants presented a permissible view of the evidence. When that occurs, "the factfinder's choice between them cannot be clearly erroneous." *Gillyard*, 261 F.3d at 509 (quoting *Anderson*, 470 U.S. at 574). As a result, we affirm the district court's determination that the initial stop was lawful.

---

[4] Defendants argue that Trooper Dollar's testimony was not sufficient to establish the "articulable facts" necessary to support reasonable suspicion and thus the magistrate judge erred in accepting it. While Trooper Dollar's testimony was sparse, he did articulate facts to support his reasonable suspicion. Specifically, he acknowledged the conditions during the day of the stop, stated that the cars were traveling at "highway speed," and explained that he takes the speed of the vehicles into account to determine if they would be able to stop in time to avoid a collision. He also testified that the cars were closer to one hundred feet apart than ten feet apart, which is consistent with Trooper Riefers's testimony and the video evidence. These facts are consistent with other testimony that has been held sufficient to justify reasonable suspicion. *Cf. United States v. Flores–Manjarez*, 421 F. App'x 407, 409 (5th Cir. 2011) (per curiam) (unpublished) (holding that the officer provided specific, articulable facts to support reasonable suspicion when he testified that the conditions were wet and that the vehicles were less than two car lengths apart).

No. 11-11228

B.    *Extent of Detention*

Appellants next challenge the extent of their detention. "Once the purpose of a valid traffic stop has been completed and an officer's initial suspicions have been verified or dispelled, the detention must end unless there is additional reasonable suspicion supported by articulable facts." *United States v. Gonzalez*, 328 F.3d 755, 758 (5th Cir. 2003). During the traffic stop, law enforcement officers are allowed to "request to examine a driver's license and vehicle registration or rental papers [and] to run a computer check on both." *Brigham*, 382 F.3d at 508. Officers may also "ask about the purpose and itinerary of a driver's trip during the traffic stop." *Id.* If during these checks additional reasonable suspicion emerges, the detention "may last as long as is reasonably necessary" to resolve the suspicion. *United States v. Fishel*, 467 F.3d 855, 856 (5th Cir. 2006). The reasonableness of the length of detention is judged by "whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly." *Brigham*, 382 F.3d at 511. "There is, however, no constitutional stopwatch on traffic stops." *Id.*

1.    *Trooper Dollar*

Trooper Dollar articulated several factors informing his suspicion that Wallstrum was engaging in criminal activity. For example, Wallstrum exhibited extreme nervousness in explaining his travel itinerary, and the explanation itself was discredited. Wallstrum had indicated that Amarillo was as far west as he had traveled, but this was contradicted by the New Mexico hotel receipt Trooper Dollar saw in the front seat. Additionally, the rental agreement had been expired for three days. Trooper Dollar also observed several food and drink containers, indicating "hard" travel that was inconsistent with the trip Wallstrum described. Finally, the close proximity of the cars indicated that Wallstrum may have been traveling in tandem with one of the other vehicles, which is common in drug trafficking. Trooper Dollar's search revealed

11

tampering with several areas of the car, which was consistent with his drug trafficking suspicion.

These factors were sufficient to provide Trooper Dollar with reasonable suspicion to justify the request to search and continued detention.  The evidence gathered from the Camry was thus properly obtained.  *See Brigham*, 382 F.3d at 512.

2.    *Trooper Riefers*

Trooper Riefers also articulated several factors informing his suspicion that Bryant and Clark were engaging in criminal activity.  For example, Bryant began exhibiting extreme signs of nervousness when asked if he was transporting anything illegal.  Additionally, Bryant and Clark gave Trooper Riefers conflicting accounts of their travel plans.  Clark told Trooper Riefers that they were headed to the Dallas/Fort Worth area while Bryant said they were traveling to see his uncle in North Carolina.  Trooper Riefers also found the car rental agreement to be suspicious because the car was rented in the name of Clark's girlfriend, who was not present, and Clark's name was handwritten into the agreement despite a separate section indicating that there were no additional authorized drivers.  Trooper Riefers also found it suspicious that Bryant and Clark were traveling along a known drug-trafficking corridor in a rental car, whose interior indicated "hard" travel based on the energy drinks, water bottles, and snack containers within it.  The close proximity of the cars also heightened his suspicion that the two were traveling in tandem with at least one other vehicle, which is a common drug-trafficking tactic.

Based on the totality of these facts, Trooper Riefers was justified in continuing the detention.  *See, e.g.*, *Pack*, 612 F.3d at 361–62 (finding extreme nervousness, irreconcilable stories, and the location of a stop on a highway frequently used by drug smugglers sufficient to establish reasonable suspicion justifying a prolonged detention); *Brigham*, 382 F.3d at 509 (finding a prolonged

detention reasonable based the defendant's presentation of a fake I.D., his inconsistent explanation for his trip, his extreme nervousness, and the absence of the authorized driver listed on the car rental agreement).  Bryant and Clark argue that the length of the detention was unreasonable because Trooper Riefers's suspicion should have been dispelled after the half-hour consensual search yielded no results.  Trooper Riefers testified, however, that his search provided information consistent with his earlier suspicion, namely, the lack of receipts for the energy drinks and snacks, the tampering of the area under the windshield, and the loose grommets and screws.  It was also during this time that Trooper Riefers learned that the driver that Trooper Dollar pulled over was telling a similar travel story to Bryant.  Based on these additional discoveries and cognizant that there is "no constitutional stopwatch on traffic stops," *Brigham*, 382 F.3d at 511, we cannot say that Trooper Riefers did not diligently pursue a means of investigation that was likely to confirm or dispel his suspicion.  As a result, the district court correctly determined that reasonable suspicion justified the prolonged detention.

*C.    Consent*

Bryant and Clark's final argument is that Bryant did not consent to having the car searched at the DPS office.  They do not dispute the validity of Bryant's initial consent to search the car but argue that the search at the DPS office constituted a second warrantless search that also required valid consent.

"To be valid, consent to search must be free and voluntary." *United States v. Kelley*, 981 F.2d 1464, 1470 (5th Cir. 1993).  Voluntariness is determined from the totality of the circumstances.  *Id.*  We make this determination by considering six factors: "(1) the voluntariness of the defendant's custodial status; (2) the presence of coercive police procedures; (3) the extent and level of the defendant's cooperation with the police; (4) the defendant's awareness of his right to refuse to consent; (5) the defendant's education and intelligence; and (6)

13

the defendant's belief that no incriminating evidence will be found." *Jenson*, 462 F.3d at 406. Each of these six factors is relevant, but no single one is dispositive. *Jones*, 234 F.3d at 242. The government has the burden of proving, by a preponderance of the evidence, that the consent was voluntary. *United States v. Shabazz*, 993 F.2d 431, 438 (5th Cir. 1993).

In analyzing Bryant's consent, the magistrate judge noted that at the time Bryant consented to both the initial search of the car and the search at the DPS office, he had all of the documents necessary for legal travel in his possession. *Cf. Santiago*, 310 F.3d at 343 (noting as one ground to support invalid consent that the trooper had not returned the defendant's driver's license and registration). Additionally, the magistrate judge found no evidence that Trooper Riefers was acting in a coercive fashion. Bryant was cooperative with Trooper Riefers throughout the process even though he had begun to express dissatisfaction with the length of the search. Though Bryant was never explicitly told that he was free to go, he gave an indication that he was aware he could refuse consent when he previously stated that he would have done so if he had known it was going to take so long. At no point during the search, however, did Bryant withdraw his undisputed initial consent. Instead, when he was told by Officer Dawson that there was reasonable suspicion to detain him further, Bryant responded, "I'll let you do your search and then I can be on my way." No narcotics were found in Bryant's car so it is likely that he believed no incriminating evidence would be found at the time he gave his consent.

Taken as a whole, the balance of the factors tends to support the district court's finding that Bryant voluntarily consented to taking the car to the DPS office. Because there is nothing in the record to suggest any clear error in the district court's determination that Bryant's consent was voluntarily given, we affirm.

No. 11-11228

## Conclusion

For the foregoing reasons, the judgment of the district court is AFFIRMED.